UNION OF CONCERNED SCIENTISTS, Petitioner,

v.

UNITED STATES NUCLEAR REGULA-TORY COMMISSION and the United States of America, Respondents,

Attorney General of Massachusetts, Arkansas Power & Light Co., et al., Intervenors.

No. 82–2053.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 6, 1984.

Decided May 25, 1984.

As Amended July 2, 1984.

William S. Jordan, III, Washington, D.C., with whom Diane Curran and Ellyn R. Weiss, Washington, D.C., were on the brief, for petitioner.

Dan M. Berkovitz, Atty., Nuclear Regulatory Com'n, Washington, D.C., with whom Herzel H.E. Plaine, Gen. Counsel, E. Leo Slaggie, Acting Sol., Mark E. Chopko, Atty., Nuclear Regulatory Com'n, Anne S. Almy and Blake Watson, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Michael B. Blume, Atty., Nuclear Regulatory Com'n, and Peter R. Steenland, Atty., Dept. of Justice, Washington, D.C., also entered appearances for respondents.

Robert E. Zahler, Washington, D.C., with whom Hannah E.M. Lieberman, Washington, D.C., was on the brief for intervenor, Arkansas Power & Light Co., et al.

Jo Ann Shotwell, Boston, Mass., was on the brief for intervenor, Atty. Gen. of Mass., Francis X. Bellotti and Stephen M. Leonard, Asst. Atty. Gen., Boston, Mass., also entered appearances for intervenor, Attorney General of Massachusetts.

Before WALD and GINSBURG, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting opinion filed by Senior Circuit Judge MacKINNON.

WALD, Circuit Judge:

■ The Union of Concerned Scientists (UCS) petitions for review of a rule promulgated by the Nuclear Regulatory Commission (NRC or Commission) providing that an atomic safety and licensing board (licensing board) need not consider the results of emergency preparedness exercises in a licensing hearing before authorizing a full power license to operate a nuclear power plant. The rule provides, in lieu thereof, that final NRC issuance of the license must be preceded by satisfactory completion of

an emergency preparedness exercise, and a conclusion by the NRC, based on this exercise, that there is reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency. UCS contends that this rule denies its statutory right to a hearing on a material issue in licensing proceedings, under Section 189(a)(1) of the Atomic Energy Act (AEA or Act), 42 U.S.C. § 2239(a)(1) (1976). Additionally, UCS also contends that the Commission acted arbitrarily and capriciously in promulgating the rule, in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A) (1982).

We find that because the rule denies a right to a hearing on a material factor relied upon by the Commission in making its licensing decisions, the rule was issued in excess of the Commission's authority under section 189(a), and must be vacated.

## I. BACKGROUND

### A. *Statutory and Regulatory Background*

In authorizing the NRC to issue licenses for nuclear power plant operation, the AEA delegates to the Commission broad discretion to decide what information it requires in making the licensing decision.[1] The Act provides that "the applicant shall state such technical specifications ... as the Commission may, by rule or regulation, deem necessary in order to enable it to find that the [applicant's activity] ... will provide adequate protection to the health and safety of the public." 42 U.S.C. § 2232 (1976).

The Act itself establishes a two step licensing procedure. An applicant for a nuclear power plant operating license must first obtain a construction permit. Section 189(a) of the Act mandates a public hearing before a construction permit can be issued.[2]

---

1. Originally, under the AEA the Atomic Energy Commission (AEC) issued licenses. In 1974, the AEC was abolished, and its licensing functions transferred to the NRC. *See* Pub.L. 93–438, 88 Stat. 1233 (1974) (codified at 42 U.S.C. § 5814 (1976)).

2. Section 189(a) of the Act as amended in 1957, Pub.L. No. 85–256, § 7, 71 Stat. 579 (1957), in 1962, Pub.L. No. 87–615, § 2, 76 Stat. 409 (1962), and in 1983, Pub.L. No. 97–415, § 12(a), 96 Stat. 2073, reads

In any proceeding under this chapter, for the granting, suspending, revoking, or amending

After a permit is issued, the prospective operator must apply for a license. The Act requires a hearing before the license is issued only if requested by an interested party.

If a hearing is requested, the Commission, under its regulations, designates a licensing board to conduct the proceeding. The licensing board, however, determines only whether the issuance of a license is authorized; the Commission actually issues the license at a later date. 10 C.F.R. §§ 2.760, 2.760a (1983). To authorize a license, the board must find that "there is reasonable assurance that the activities to be authorized by the operating license can be conducted without endangering the health and safety of the public ...." 10 C.F.R. § 2.104 (1983). The scope of the board's hearing is determined by the specific issues material to that determination that are raised by the requesting party.

If the licensing board authorizes a license, prior to its issuance the NRC staff conducts preoperational testing to ensure that the operation of the completed plant comports with the expectations underlying the authorization. If in the course of this final review significant safety hazards are discovered, then additional hearings may be held at the Commission's discretion. *See generally Pacific Gas & Electric Co.* (Diablo Canyon Nuclear Power Plant, Units 1 and 2), 14 NRC 950 (1981).

## B. *History of Emergency Preparedness Exercises*

After the 1979 accident at Three Mile Island (TMI) the Commission, for the first time, required offsite emergency plans as a condition of a nuclear reactor operating license. Up to that time, state and local governments prepared such emergency plans on a voluntary basis, if at all. Following the TMI incident, the President's Commission on the Accident at Three Mile Island found that "the [emergency offsite] response was dominated by an atmosphere of almost total confusion." *Report of the President's Commission on the Accident at Three Mile Island—The Need for Change: The Legacy of TMI* 17 (1979). The President's Commission recommended that in the future before a utility was granted an operating license, offsite emergency response plans should be developed by state authorities, evaluated by the Federal Emergency Management Agency (FEMA), and the means for implementing them put in place.

The TMI episode also produced a shift in the NRC's attitude about offsite emergency planning. After the accident, the Commission announced that it now "view[ed] emergency planning as equivalent to ... siting and design in public protection." 44 Fed.Reg. 75169 (1979) (proposed rule on emergency response plans). In 1980, after rulemaking proceedings, the Commission published its first final rule addressing offsite emergency preparedness. This rule provides:

> No operating license for a nuclear power reactor will be issued unless a finding is made by NRC that the state of onsite and offsite emergency preparedness provides reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency.

---

of any license or construction permit, or application to transfer control, and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees, ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding. *The Commission shall hold a hearing after thirty days' notice and publication once in the Federal Register, on each application ... for a construction permit for a facility....* In cases where such a construction permit has been issued following the holding of such a hearing, the Commission may, in the absence of a request therefor by any person whose interest may be affected, issue an operating license or an amendment to a construction permit or an amendment to an operating license without a hearing, but upon thirty days' notice and publication once in the Federal Register of its intent to do so....

42 U.S.C.A. § 2239(a) (West Supp.1983) (emphasis supplied).

10 C.F.R. § 50.47(a)(1) (1983). Pursuant to the rule, FEMA is to make findings and determinations on whether offsite "emergency plans are adequate and whether there is reasonable assurance that they can be implemented." 10 C.F.R. 50.47(a)(2) (1983). The Commission in turn will base its findings on the state of emergency preparedness on FEMA's findings, which constitute a rebuttable presumption as to the adequacy and implementation capability of the emergency plans. *Id.*

The rule, however, expressly conditions licensing of plants on satisfaction of sixteen specific standards for emergency preparedness plans. One of those standards requires that

[p]eriodic exercises are (will be) conducted to evaluate major portions of emergency response capabilities, periodic drills are (will be) conducted to develop and maintain key skills, and deficiencies identified as a result of exercises are (will be) corrected.[3]

10 C.F.R. § 50.47(b)(14) (1983). For new plants,

a full scale exercise which tests as much of the licensee, State and local [onsite and offsite] emergency plans as is reasonably achievable without mandatory public participation shall be conducted ... within one year *before* issuance of the first [full power] operating license.

10 C.F.R. Part 50, Appendix E, Section F1 (1983) (emphasis supplied). As originally promulgated, the rule said nothing specific either way about including the results of

these compulsory exercises within the scope of the licensing authorization hearing.[4]

## C. *The Challenged Rule on Emergency Exercises*

On July 13, 1982, the NRC issued an amendment to its rule on emergency preparedness, eliminating the emergency exercise as a prerequisite to *authorization* of a license. 10 C.F.R. § 50.47(a)(2) (1983) [hereinafter referred to as the Amendment]. The Amendment added to the language of the original rule the following provision:

Emergency preparedness exercises ... are part of the operational inspection process and are not required for any initial licensing decision.

10 C.F.R. § 50.47(a)(2) (1983). Despite this language, however, it left intact Appendix E's requirement for emergency preparedness plans that full scale exercises be held within one year before full power operation and the original rule's requirement that identified deficiencies be corrected. And, in response to comments by interested parties, the Commission reiterated that "exercise[s] will [still] be held before full power [operation], and all significant deficiencies will be properly addressed." 47 Fed.Reg. 30233 (1982). The Commission's rationale for the Amendment was that it would allow exercises to be held at a time closer to full power operation of a plant, thereby making them more meaningful. *See* 47 Fed.Reg.

---

**3.** This provision applies to existing operating licenses as well as newly issued licenses. See 10 C.F.R. Part 50 Appendix E, § F 1.a.

**4.** In some cases, licensing boards apparently authorized licenses without considering emergency preparedness exercises. *See, e.g.,* Pennsylvania Power and Light Co. (Susquehanna Steam Electric Station, Units 1 and 2), 15 NRC 771 (1982). In other cases, the licensing board conditioned its authorization upon exercises demonstrating the adequacy of the emergency preparedness plans. *See, e.g.,* Southern California Edison Co. (San Onofre Nuclear Generating Station, Units 2 and 3), 15 NRC 1163, 1210 (1982); *cf.* The Cincinnati Gas & Electric Co. (Wm. H. Zimmer Nuclear Power Station, Unit

1), 15 NRC 1549, 1566 (in hearing prior to exercises, the inability of FEMA witnesses to address details and problems of plan implementation precluded authorization), *modified in relevant part,* 17 NRC 760 (1983) (in light of the 1982 amendment to the rule on emergency preparedness, no need for licensing board to wait for final FEMA determination on adequacy of plans to hold further hearings). Prior to the amendment of the emergency preparedness rule, we are aware of no case in which the Commission or one of its licensing boards squarely addressed the issue of whether, in the face of a challenge to the lack of emergency exercises, the board could authorize a license prior to such exercises.

30233 (1982); 48 Fed.Reg. 16693 (1983). It in no way contended in its explanation for the rule, nor does it do so on this appeal, that the exercises are no longer material to its licensing decision. It argues instead that, under the Amendment, "these exercises are treated as part of preoperational testing of nuclear plants, which as a matter of longstanding regulatory practice has been conducted in the *post-adjudicatory phase of licensing."* Brief for Respondent, Summary of Argument (emphasis supplied). Indeed, it concedes that its "evaluation of the exercise results ... *[is] part of the administrative record for the licensing decision* and thereby subject to judicial review." *Id.* (emphasis supplied). In short, the odd choice of language in the Amendment notwithstanding it seems clear from the NRC's accompanying explanation and from its contentions on this appeal that it interprets its own Amendment as retaining evaluation of the offsite emergency exercises as a licensing prerequisite, but as taking the exercises out of the licensing hearing, and making them instead part of the staff's preoperational testing.[5]

Prior to the promulgation of the Amendment, several interested parties expressed concern that the change would eliminate public participation in the review and assessment of exercises. The Commission responded that "such assessments are not necessary to make the kind of predictive finding on emergency planning called for by the regulations prior to license issuance."[6] *Id.* at 30233. It further noted that an interested party may seek to reopen a concluded hearing or petition for

rescission of a license, should the "actual conduct of an exercise identify fundamental defects in the way that an emergency plan is conceived." *Id.* The Commission distinguished such fundamental defects justifying reopening of a hearing from those "which only reflect the actual state of emergency preparedness on a particular day in question." *Id.*

## D. *Post-Amendment Developments*

Following promulgation of the Amendment, UCS petitioned the NRC to again amend the rule to provide specifically for a hearing on the results of the onsite and offsite exercises. The Commission denied UCS's petition, relying on the need for "the full-scale exercise [to] be held as close in time as possible to commercial operation of the facility." Denial of Petition for Rulemaking, 48 Fed.Reg. 16693 (1983). The Commission stated that "it is clearly impractical to hold the full-power proceeding record open solely for the purpose of litigating the results of the full-scale offsite exercises held at a time close to commercial operation." *Id.*

At the same time UCS filed its rulemaking petition, it petitioned this court to invalidate the Amendment, on the grounds that it violates Section 189(a) of the AEA, 42 U.S.C. § 2239(a) (1976), by denying affected members of the public a hearing on issues of fact material to the NRC's licensing decision, and that the Commission's decision to adopt the Amendment was arbitrary and capricious. We find that the

---

5. The Commission said the Amendment merely clarified that the findings on emergency planning required by the original rule for issuance of a license, were "predictive in nature and need not reflect the actual state of preparedness at the time the finding is made." 47 Fed.Reg. 30232 (1982). However, in assessing the Amendment's effect on public participation, the Commission stated "the rule changes will have the likely effect of limiting litigation of the success of exercises in licensing hearings," 47 Fed.Reg. 30233 (1982), thus acknowledging that the Amendment would to some extent modify

the existing practices of exploring the exercise results in the licensing authorization hearing.

6. Commissioner Gilinsky dissented from the challenged Final Rule (the Amendment) noting:
   [t]he exercises never completely follow ... [emergency preparedness] plan[s]. And this area happens to be one in which the nuclear plant's neighbors have special competence, greater in some respects than that of NRC or FEMA. Their comments can be particularly useful. These need not be presented in formal hearings, but we should have some means to receive and consider them.

Amendment is invalid because it denies statutorily prescribed hearing rights.[7]

## II. SCOPE OF THE LICENSING PROCEEDING

We address first the position of counsel for Intervenor, Arkansas Power & Light Company (Utility)—that evaluation of emergency preparedness exercises is part of the NRC's ongoing monitoring function of operating power plants rather than part of its initial licensing responsibilities.[8] The Utility argues that the monitoring function encompasses "licensing requirements" that are evaluated in a staff inspection prior to issuance (but after authorization) of a license. Brief for Intervenor-Utility at 32. That argument is flawed, however, because the Commission itself says that it relies on its assessment of emergency exercises in deciding whether to issue a license.[9] Clearly, then, those exercises cannot be viewed as falling outside of the licensing proceeding.

Our view tracks the language of section 189(a). That section does not differentiate between the "authorization" and the "issuance" of a license for purposes of guaranteeing a hearing on request. Since the NRC, by its own regulations, has made correction of deficiencies identified in emergency exercises a requirement of its ultimate licensing decision, it would seem to follow that results of these exercises must be subject to the section 189(a) hearing requirement.

We find support for a literal application of section 189(a)'s hearing requirement in two of our own court's recent cases. In *Lorion v. NRC,* 712 F.2d 1472, 1475 (D.C. Cir.1983), *cert. granted,* —— U.S. ——, 104 S.Ct. 1676, 80 L.Ed.2d 152 (1984), we held that section 189(a) does not mandate a hearing when the NRC denies a request that it institute a license amendment proceeding.[10] *Lorion* rejected the rationale of *Natural Resources Defense Council, Inc. v. NRC,* 606 F.2d 1261 (D.C.Cir.1979), which had held that NRC rejection or approval of such a request came under section 189(a) because it was a necessary first step to license amendment. *Lorion,* 712 F.2d at 1478; *see id.* at 1479 n. \*\* (noting full court approval of *Lorion*'s position as law of the circuit). In doing so, *Lorion* relied on section 189's specification of the NRC actions—grants, suspensions, revocations, or amendments of any license or construction permit—that require a hearing, citing language of the Seventh Circuit that "[a]t least on a literal reading of section [189] ... den[ial of a] request ... to initiate a revocation proceeding was not an order final or otherwise, in a section [189(a)] proceeding". *Id.* at 1476 (quoting *Rockford League of Women Voters v. NRC,* 679 F.2d 1218, 1220 (7th Cir.1982)).

This court again adopted a literalist approach toward section 189(a) in upholding the NRC's narrowly defined scope of a licensing amendment proceeding in *Bellotti*

47 Fed.Reg. 30235 (1982).

7. Because we find that the Amendment contravenes Section 189(a) of the AEC, 42 U.S.C. § 2239(a) (1976), we need not decide if the NRC acted arbitrarily and capriciously in adopting it.

8. The NRC does not appear to have taken this position either in its brief or at oral argument. Although the NRC concedes that the assessment of exercises is part of its licensing decision, it emphasizes the ongoing nature of the exercise requirement as part of its argument for discretion to exclude exercise evaluations from licensing hearings.

9. *See supra* text at note 4 (NRC regulations require exercises before license is issued); Brief for Respondent at 39 n. 20 (evaluation of emergency exercises is part of the "administrative record as a whole, which by definition includes

the material on which the Commission *relies* for its decision") (emphasis supplied).

10. *Lorion* decided that this court did not have jurisdiction to directly review an NRC denial of a request to institute amendment proceedings. *Lorion* relied, however, on section 189(b)'s express provision limiting this court's "reviewing authority to final orders entered pursuant to the kind of 'proceedings' specified in 42 U.S.C. § 2239(a), [section 189(a)]." *Lorion,* 712 F.2d at 1476. Thus, crucial to the *Lorion* holding, was the interpretation that section 189(a) proceedings do not include requests to initiate licensing amendments. *See id.* at 1478 ("'proceeding' [in section 189(a)] cannot mean one thing for procedural purposes and another for jurisdictional purposes").

*v. NRC,* 725 F.2d 1380 (D.C.Cir.1983). In *Bellotti,* the NRC had found serious deficiencies in management of a nuclear plant in Massachusetts that posed threats to the safety of residents in the area surrounding the plant. The Commission ordered a license amendment which required the licensee to submit, within 30 days, a safety-related plan of action for NRC approval. The Attorney General of Massachusetts sought to intervene and requested a 189(a) hearing on, inter alia, the adequacy of the plan. This court held that, despite the State of Massachusett's obvious interest in the safe operation of the licensee's plant, it had no cognizable adverse interest in the license amendment proceeding which involved only the issue of the Commission's order to the utility to develop a safety plan. "[T]he development of the plan of action [took] place outside the proceeding" and was not part of the NRC's decision to amend the license. *Bellotti,* 725 F.2d at 1382. We sustained NRC's reading of section 189(a) to grant a hearing only as to the issues material to the Commission's licensing decision.

In arguing that the Amendment contravenes section 189(a), UCS does not object, as did the petitioner in *Bellotti,* to the Commission's restriction of the issues material to its licensing decision. The Commission, in this case, has defined as such an issue whether the preparedness plans provide adequate assurances of safety in case of a radiological emergency. It concedes that in making its ultimate finding on this issue it relies on emergency exercise evaluations. Thus, unlike in *Bellotti,* here the Commission has removed from the licensing hearing *consideration of evidence that it considers relevant* to a material issue in the section 189(a) proceeding *as it has defined that issue.* Not only is this different from the NRC position we condoned in *Bellotti,* in fact, it is in tension with *Bellotti's* conclusion, in the context of a license amendment, that "public participation is automatic with respect to all [section 189(a)] Commission actions that are potentially harmful to the public health and welfare." *Bellotti,* 725 F.2d at 1383.

When NRC advocates successfully for a literal construction of 189(a)'s hearing requirement, it must take the bitter with the sweet: If section 189(a)'s precise language controls when intervenors attempt to obtain a hearing on a proposed amendment or to expand a proceeding to cover alternatives to the NRC's proposed amendment, it also controls when the NRC or an intervenor tries to limit the hearing requirement to *less* than the issues the NRC has itself defined as part of the "licensing proceeding" specified in 189(a). *See, e.g., Brooks v. AEC,* 476 F.2d 924 (D.C.Cir.1973) (petitioners entitled to a hearing before AEC extended construction permit completion dates); *see also* 100 Cong.Rec. 10686 (1954) (section 189(a) was amended to "clearly specify the types of Commission activities in which a hearing is to be required"). Just as we ruled in *Lorion* that until granted, a request for agency action specified in section 189(a) "is not a 'proceeding' where the requestor has any right to present evidence." 712 F.2d at 1478, so must we now rule the converse, *i.e.,* that once a hearing on a licensing proceeding is begun, it must encompass all material factors bearing on the licensing decision raised by the requester. *See Porter County Chapter of the Izaak Walton League v. NRC,* 606 F.2d 1363, 1368 (D.C.Cir.1979) ("such proceedings as are begun shall be formal, public hearings").

The Commission and the Utility argue, alternatively, that the Amendment still allows enough opportunity for public participation in the assessment of the exercise results to satisfy section 189(a)'s hearing requirement. As stated above, the Commission invites petitioners to reopen the hearing if the exercise identifies fundamental defects in the emergency preparedness plans. The Utility points in particular to the Commission's willingness under the amended rule to reopen closed proceedings or institute new proceedings upon a request by an interested party alleging inadequate emergency preparedness. *See* Brief for Intervenor-Utility at 45 & n. 23, *see also* Brief for Respondent at 40 & n. 21

(pointing to willingness to reopen proceedings in cases where other safety deficiencies discovered).

We do not think the Commission's overture is broad enough to comply with section 189(a)'s requirement. We held in *Lorion* that a request to initiate license amendment proceedings under 10 C.F.R. § 2.206 (1983) is not a section 189(a) proceeding. *See* 712 F.2d at 1478–79. Our rationale was that the Commission's recognized discretion to "make whatever unilateral inquiries [it] deems necessary" in deciding whether to grant a request for initiation of a proceeding could not be squared with the requirement for a fullfledged hearing in section 189(a) proceedings.[11] *Id.* at 1475. We noted that "unless and until [the request is] granted it is not a 'proceeding' where the requester has any right to present evidence." *Id.* at 1476. The same

regulation, 10 C.F.R. § 2.206, that governs a request to initiate an amendment proceeding also governs the Commission's discretion in denying a request to reopen a closed proceeding. In short, we believe the core question in this case is whether the NRC, consistent with section 189(a), may eliminate a material public safety-related factor in its decision from the licensing hearing in the interest of making the process more efficient. We turn now to that question.

### III. DISCRETION TO LIMIT THE SCOPE OF SECTION 189(a) HEARINGS

■ When a statute requires a "hearing" in an adjudicatory matter, such as licensing, the agency must generally provide an opportunity for submission and challenge of evidence as to any and all issues of material fact.[12] *See General Mo-*

---

**11.** The Commission has nowhere *obligated itself* to hold any evidentiary hearing or to reopen proceedings if an exercise "calls into question whether the requirements of C.F.R. 50.47 can or will be met." 47 Fed.Reg. 30233 (1982). Its comments upon adopting the Amendment state only that in such a case "a party ... *may seek to reopen* a concluded hearing or file a petition for action pursuant to 10 C.F.R. 2.206." *Id.* (emphasis supplied). In denying UCS's subsequent rulemaking petition, the NRC said:

> [i]f ... some key aspect of the plan turns out to be inadequate or unworkable, or the judgments reflected in the planning process are untenable, or major revisions will be necessary, the hearing *could be reconvened upon a showing that the Commission's standards for reopening have been met....* Where appropriate, any person *may request* that the Commission institute a proceeding to take immediate action under 10 C.F.R. 2.206. Such action *could include, in extraordinary circumstances,* suspension of the license pending correction of the deficiency.

48 Fed.Reg. 16693 (1983) (emphasis supplied); *see also id.* ("if exercises showed that the plan ... [was] seriously flawed ... reopening of the hearing record *might* be appropriate") (emphasis supplied). Furthermore, these statements must be read in light of the Commission's practice generally not to reopen a hearing absent "new information [that] would clearly mandate a change in result." *Georgia Power Co.* (Alvin W. Vogtle Nuclear Plant, Units 1 and 2), 14 NRC 265, 271 (1981).

**12.** Although section 189(a)'s hearing provision lacks the magic words "on the record," there is much to suggest that the Administrative Proce-

dure Act's (APA) "on the record" procedures, 5 U.S.C. §§ 554, 556, 557 (1982), apply. *See Porter County,* 606 F.2d at 1368 n. 12 (dicta stating that "on the record" procedures apply); *see also City of West Chicago v. NRC,* 701 F.2d 632, 642 (7th Cir.1983) (dicta stating that the legislative history of section 189(a) indicates that formal proceedings are required for issuing a nuclear power plant license, but not for issuing a material handling license); *but cf.* 2 K. Davis, Administrative Law Treatise, 450 (2d ed. 1979) (criticizing reading of APA used by *Porter County*). First, licensing is adjudication, and when a statute calls for a hearing in an adjudication the hearing is presumptively governed by "on the record" procedures. *See Seacoast Anti-Pollution League v. Costle,* 572 F.2d 872, 876–77 (1st Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978). Second, in 1961, the AEC specifically requested Congress to relieve it of its burden of "on the record" adjudications under 189(a). *See generally* Staff of the Joint Committee on Atomic Energy, 87th Cong., 1st Sess., *Improving the AEC Regulatory Process, Vol. 1* (Comm. Print 1961), [hereinafter cited as JCAE Report]. In response, Congress enacted the present provision permitting a license to be granted without a hearing when no hearing was requested. But it did not alter in any way the existing interpretation or definition of a 189(a) hearing, thereby apparently reaffirming its intent that "on the record" procedures apply in licensing. *See* S.Rep. No. 1677, 87th Cong., 2d Sess. 6–7 (1962) U.S.Code Cong. & Admin.News 1962, p. 2207; *see also Independent Bankers Association v. Board of Governors of the Fed. Reserve Sys.,* 516 F.2d 1206, 1218–19 (D.C.Cir.1975) (interpreting similar congressional action as indicating "on

*tors Corp. v. Federal Energy Regulatory Commission*, 656 F.2d 791, 795 & n. 7 (D.C.Cir.1981); *Public Service Co. v. Federal Energy Regulatory Commission*, 600 F.2d 944, 955 (D.C.Cir.), *cert. denied*, 449 U.S. 990, 100 S.Ct. 520, 62 L.Ed.2d 419 (1979); *Independent Bankers Association of Georgia v. Board of Governors of the Federal Reserve System*, 516 F.2d 1206, 1220 (D.C.Cir.1975); *see also Siegel v. NRC*, 400 F.2d 778, 784 (D.C.Cir.1968) ("the hearing granted by the [AEC] presumably must embrace all relevant matters"). It is undisputed that the Commission must make an ultimate finding in a licensing proceeding that "there is reasonable assurance that adequate protective measures can and will be taken in the event of radiological emergency." 10 C.F.R. 50.57(a)(1). Both the NRC and FEMA, which has been

assigned the task of making a preliminary finding on the adequacy of offsite emergency preparation, require by rule an assessment of emergency exercises, which they then rely on in determining the adequacy of emergency plans to ensure the surrounding community's safety in the case of a radiological accident.[13] *See* 10 C.F.R. Appendix E § F 1.a. (1983); 44 C.F.R. § 350.9 (1983). Although in any particular licensing proceeding, the exercise may not raise any material issues about the adequacy of the preparedness plans, the Commission cannot and does not argue that assessment of these exercises is immaterial to its licensing decision.[14]

The Commission argues instead that, although assessment of emergency exercises is generally material to the licensing deci-

the record" procedures apply in adjudications under the Bank Holding Company Act). Third, more recently in amending section 189(a) to allow hearings after (rather than prior to) a license amendment where the NRC determines that the amendment involves no significant hazards, Congress again assumed that the amendment hearings were "on the record." *See, e.g.,* H.R.Rep. No. 22, Part 2, 97th Cong., 1st Sess. 9 (1982). Finally, over the past twenty years the NRC has consistently taken the position that section 189(a) calls for "on the record" hearings in adjudications. *See* JCAE Report, *supra*, at 48–49 (1961) (Commission views statute, as amended in 1957, as requiring formal procedures); *Philadelphia Newspapers, Inc. v. NRC*, 727 F.2d 1195 at 1199–1202 (D.C.Cir., 1984) ("Commission apparent[ly] interpret[s] ... Section 189(a) as requiring formal hearings in licensing proceedings").

Nonetheless, we refrain from holding outright that section 189(a) requires "on the record" hearings in licensing adjudications. The parties did not brief this issue, and the Commission's regulations governing licensing proceedings provide for hearing procedures that comport with or even surpass those required by the APA for "on the record" adjudication. *Compare* 10 C.F.R. §§ 2.700–2.780 (1982) (NRC regulations on hearings) *with* 5 U.S.C. §§ 554, 556, 557 (1982) (APA "on the record" adjudicatory procedures). The issue presented to us by the parties is whether the NRC can, in its discretion, bypass section 189(a)'s hearing requirement altogether on issues material to its licensing decision.

**13.** FEMA requires the exercises as a prerequisite for its approval of state and local plans for purposes of federal assistance but not for its findings on adequacy, which it submits to the

NRC. Nonetheless, FEMA's rule includes exercises as a criteria for its "findings and determinations as to the adequacy of the State and local plans and the capabilities of the State and local governments to effectively implement these [emergency preparedness] plans." FEMA Review and Approval of State and Local Radiological Emergency Plans and Preparedness, 48 Fed. Reg. 44332 (1983) (Final Rule). In commenting on UCS's rulemaking petition that hearings on the emergency exercises be held, FEMA stated:

FEMA wishes to reaffirm the importance and value of the joint exercise for FEMA's findings concerning the adequacy of offsite plans and preparedness. A full-scale joint exercise ... is necessary if FEMA is to certify in a finding that State and local governments are capable of protecting public health and safety in the event of an accident at a commercial nuclear power plant.

Letter from Dave Mclaughlin, Deputy Associate Director, State and Local Programs Support, to NRC (docketed Jan. 27, 1983).

**14.** Contrary to the dissent's suggestion otherwise, Diss. Op. at n. 2, we do recognize that the Amendment makes the NRC's requisite findings on emergency preparedness more predictive in nature. But even under this amended standard, which is not challenged in this case, the NRC requires a successful evaluation of onsite and offsite emergency exercises before it issues a full power operating license. *See supra* text at nn. 4–6. Our holding today in no way reflects on the propriety or impropriety of that modified substantive standard, it only requires that emergency exercise evaluations be subject to public hearings because they are material to the NRC's licensing decision under the new standard. *See infra* text at n. 20.

sion, section 189(a) still leaves it discretion to evaluate the exercises outside the hearing procedure preparatory to making its ultimate finding on the adequacy of offsite preparation. Under its amended rule, the "exercises are treated as part of the preoperational testing of nuclear plants, which as a matter of longstanding regulatory practice has been conducted in the post-adjudicative phase of licensing." Brief for Respondents, Summary of Argument. It further claims that reading the AEA to require hearings on all issues relevant to licensing would place an unrealistic and unreasonable burden on the NRC's ability to achieve its "statutory objectives in a timely and efficient manner." *Id.*

### A. The Balance Between Efficiency of Proceedings and the Public's Right to a Hearing

■ We have already acknowledged that the NRC has great discretion to decide what matters are relevant to its licensing decision, *see Siegel,* 400 F.2d at 783. We conclude, however, that its discretion to limit public participation in resolving the matters it deems relevant is more circumscribed as a result of section 189(a)'s hearing requirements. Administrators may not lightly sidestep procedures that involve the public in deciding important questions of public policy. *Environmental Defense Fund, Inc. v. Ruckleshaus,* 439 F.2d 584, 594 (D.C.Cir.1971). "[T]he Commission is entitled to great freedom in its efforts to structure its proceedings so as to maintain their integrity while assuring meaningful public participation, *but one of its goals must be to assure that there is meaningful public participation.*" *Bellotti,* 725 F.2d at 1389 (Wright, J., dissenting) (emphasis in original).

In this case, we believe the Commission has upended the balance struck by Congress between efficiency and public participation. In 1961, the AEC requested that Congress relieve it of the burdens and de-

lays caused by licensing hearings. Congress relieved the Commission of these burdens only to the extent of allowing licensing without a hearing in the absence of a request. Congress was influenced in that decision by the Staff Report of the Joint Committee on Atomic Energy,[15] which stated:

> [t]he gravity of the safety questions decided whenever a license is issued makes it important to provide an opportunity for interested members of the public to attend and to furnish an inducement to both applicant and staff to formulate their respective views in terms so susceptible to lay understanding as the subject permits. Moreover, in doing "the homework" for such a hearing, the applicant or the staff may view the problems they have been considering in a new perspective and may become aware of a new way to rethink or reexamine some facet of a problem.

JCAE Report, *supra* note 12, at 49.

The NRC again went to Congress in 1982 complaining about the delay that public hearings on licensing normally cause, exacerbated at that time by the logistical deployment of the NRC staff to handle the Three Mile Island situation. It asked for authority to grant interim licenses without a hearing. At about the same time, in response to this court's decision in *Sholly v. NRC,* 651 F.2d 792 (D.C.Cir.1981), *vacated and remanded,* —— U.S. ——, 103 S.Ct. 1170, 75 L.Ed.2d 423 (1983), it asked for authority to issue license amendments without hearings if they involved "no significant hazards consideration." S.Rep. No. 113, 97th Cong., 1st Sess. 14 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3592, 3598. Although Congress granted the Commission partial relief on both requests, *see* 42 U.S.C.A. §§ 2239(a), 2242 (West Supp.1983), it stressed the importance of the section 189(a) hearing requirement by requiring the agency to hold hearings subsequent to the issuance of the tem-

---

**15.** The Joint Committee was established in 1954 to monitor for Congress developments under the Atomic Energy Act of 1954. *See* 42 U.S.C. §§ 2251–2257 (1976). It was abolished in 1977. *See* 42 U.S.C. § 2258 (Supp. V. 1981).

porary license or the license amendment.[16] The House Report noted:

> the hearing process serves a vital function as a forum *for raising relevant issues* regarding the design, construction and operation of a reactor, and for providing a means by which the applicant *and the Commission staff* can be held accountable for their actions regarding a particular facility.... [T]he hearing process is essential to obtaining public confidence in the licensing process which is needed if the nuclear option is to be preserved.

H.R.Rep. No. 22, Part 2, 97th Cong., 1st Sess. 11 (1982) (emphasis supplied).

The Commission points to one paragraph in the 1961 JCAE Report as showing that Congress contemplated reliance on staff, rather than a public hearing, to resolve issues of implementation left open after the licensing hearing.[17] *See* Brief for Respondent at 30. That paragraph, however, was written in the context of a proposed procedure, not ultimately adopted, entailing a single public hearing prior to issuance of the construction permit with no subsequent hearing required before issuance of the operating license.[18] *See* JCAE Report, *supra* note 12, at 72–73. Since that proposal envisioned no further hearings after the

construction permit was issued to decide issues material to the licensing decision, absent a specific order of a future hearing by the licensing board, those decisions perforce had to be left to staff inspections and recommendations. Congress, of course, did not adopt the single hearing proposal; it opted instead for further public hearings before licensing *upon request of any interested party*. *See* Pub.L. No. 87–615, § 2, 76 Stat. 409 (1962). In so doing, we believe Congress vested in the public, as well as the NRC staff, a role in assuring safe operation of nuclear power plants. In sum, we find no basis in the statute or legislative history for NRC's position that Congress granted it discretion to eliminate from the hearing material issues in its licensing decision.

Our decision that the hearing requirement of section 189(a) includes factual issues raised about the preparedness exercises is not overly restrictive. In its supporting statement for the Amendment, the Commission said that "[t]he conduct of full-scale exercises early enough in the licensing process to permit the outcome of the exercises to be fully litigated at the [licensing] hearing is premature." 47 Fed.Reg. 30233 (1982). If that is so, we see nothing to prevent the Commission from holding a special supplementary hearing solely on is-

**16.** Congress allowed the NRC to grant temporary licenses without a prior hearing as "an extraordinary and temporary cure for an extraordinary and temporary problem." H.R.Rep. No. 22, Part 2, 97th Cong. 1st Sess. 9 (1982); *see also* Sen.Rep. No. 113, 97 Cong., 1st Sess. 13 (1982). This authority expired on December 31, 1983. *See* 42 U.S.C.A. § 2242(e) (West Supp. 1983).

The subsequent hearing for a temporary license, although not governed by the full procedural requirements applied to 189(a) hearings by NRC regulations, was to afford *"full disclosure of material facts on all substantial issues* raised in connection with the issuance of any temporary operating license." H.R.Rep. No. 22, Part 2, 97th Cong., 1st Sess. II (1982) (emphasis supplied). Furthermore, a full section 189(a) hearing for a final operating license had to "be concluded as promptly as practicable." 42 U.S. C.A. § 2242 (West Supp.1983).

**17.** That paragraph states:

[A Licensing] Board should be authorized to impose conditions in any decision on whether

a construction permit or a license should issue. In so doing, it should specify whether a further hearing should be held to determine whether the conditions have been satisfied, or whether reports of AEC hazards analysis staff or staff inspectors to be placed in the public record might suffice. In many cases, the public interest in safety could be adequately served by the latter procedure. If conditions proposed by the Board are not satisfactory to the applicant or to the staff, the Board should provide for conferences in order to consider possible alternatives compatible with its objectives which would be more satisfactory.
JCAE Report, *supra* note 12, at 72–73.

**18.** The proposed licensing procedure provided:
The Board should decide that an operating license should issue after publishing notice of intent to do so, but without a hearing unless it determines that a hearing would be in the public interest.
JCAE Report, *supra* note 12, at 73.

sues raised by the emergency exercises closer to the date of full power operation.[19] And certainly the Commission can limit that hearing to issues—not already litigated—that it considers material to its decision.

So viewed, we find that section 189(a)'s hearing requirement does not unduly limit the Commission's wide discretion to structure its licensing hearings in the interests of speed and efficiency. For example, the Commission argues throughout its brief that the exercise is only relevant to its licensing decision to the extent it indicates that emergency preparedness plans are fundamentally flawed, and is not relevant as to minor or ad hoc problems occurring on the exercise day. Today, we in no way restrict the Commission's authority to adopt this as a substantive licensing standard.[20] *See Siegel,* 400 F.2d at 783 ("broad responsibility ... reposed in [the NRC]" justified its decision that the security of a power plant from enemy takeover is not relevant to licensing); *see also North Anna Environmental Coalition v. NRC,* 533 F.2d 655, 689–90 (D.C.Cir.1976) (upholding decision in a particular licensing proceeding that siting of plant on geological

fault was not unduly unsafe); *Westinghouse Electric Corp. v. United States,* 598 F.2d 759, 771–73 (3d Cir.1979) (NRC had broad discretion to impose moratorium on decisionmaking regarding recycling of nuclear fuel in light of uncertainty about efficacy of recycling). Under that standard, the NRC could summarily dismiss any claim that did not raise genuine issues of material fact about the fundamental nature of the emergency preparedness plans. *See* 10 C.F.R. § 2.749 (1983). To avoid summary disposition, a party would have to identify and support specific facts upon which a reasonable inference could be drawn that the plan provided inadequate assurances of safety. *See id.; BPI v. AEC,* 502 F.2d 424, 428 (D.C.Cir.1974) (under section 189(a) "Commission [may] require that prospective intervenor first specify basis for a hearing"); *see also National Souvenir Center, Inc. v. Historic Figures Inc.,* 728 F.2d 503 at 512–513 (D.C.Cir.1984) (stating test for genuine issue of material fact). If a party's claim survived summary disposition, the Commission might then use expedited procedures to shorten the period between the exercises and the date of license.[21] However the Commission wishes

**19.** The Commission dismissed this option as "impractical" when it denied UCS's rulemaking petition. 48 Fed.Reg. 16693 (1983). In doing so, however, it seems to have conceded that supplementary hearings would alleviate the problem of premature emergency exercises, but nonetheless rejected such hearings because "delay would occur without commensurate safety benefit in the ordinary case." *Id.* Our conclusion, that Congress did not authorize the Commission to eliminate hearings on issues material to its licensing decision under an efficiency rationale, precludes its rejection of a supplementary hearing, in favor of no hearing at all, on that basis. *See supra* text at notes 12–18.

**20.** Of course, if such a standard were challenged in court, the NRC might still have to defend itself against allegations that it had acted arbitrarily and capriciously. *See* 5 U.S.C. § 706 (1982); 42 U.S.C. § 2239(b) (1976) (invoking section 706).

**21.** The Commission's regulations allow the licensing board to expedite proceedings by focusing the proceedings on the key contested issues, *see e.g.,* 10 C.F.R. § 2.751 (prehearing conference), and by strictly limiting the presentation

of evidence and cross examination to relevant and non-repetitive material. *See* 10 C.F.R. § 2.757 (authority of presiding officer to regulate procedure in a hearing). Although we do not express any opinion about the extent to which the NRC could or should expedite procedures, we note past criticisms that it has overformalized its procedures. *See* Tourtellotte, *Nuclear Licensing Litigation: Come On In, the Quagmire is Fine,* 33 Admin.L.Rev. 367 (1981); *cf.* Cotter, *Nuclear Licensing: Innovation Through Evolution in Administrative Hearings,* 34 Admin.L.Rev. 497 (1982) (generally applauding recent efforts of NRC to expedite hearings but warning of possible due process violations).

The dissent states that holding hearings on emergency exercises evaluations could delay licensing proceedings "up to two years in cases where the Commission's decisions are appealed to courts." Diss.Op., text at n. 6. This not only ignores the potential for time savings by use of expedited procedures, but it incorrectly assumes that a license cannot issue until the Commission and the courts affirm the licensing board decision. To the contrary, within 30 days of the board's decision, the Commission will determine whether to stay the issuance of the license. 10 C.F.R. § 2764(f)(2)(iii) (1983).

to do it, the only central requirement is that there be an opportunity to dispute issues raised by the exercises under the relevant decisionmaking criteria.

B. *Assessment of Exercises as Preoperational Testing*

Finally, the NRC justifies removing exercise results from the licensing hearing because it believes they are more appropriately treated as part of the preoperational testing process, which has traditionally been exempted from the licensing hearing. Brief for Respondent at 26. The AEA does not explicitly except preoperational testing from section 189(a)'s hearing requirement, but the NRC argues that such an exception reflects the practical realities of the licensing duties which Congress imposed on it. The argument depends on two propositions: (1) that for certain NRC decisions public hearings serve little purpose and those decisions should be excepted from section 189(a) hearings, and (2) evaluations of emergency preparedness are such decisions.

Although the AEA includes no exceptions to section 189(a), there is something to be said for the first proposition: Obviously, Congress did not mean to require a hearing where a hearing serves no purpose. In determining the scope of such an exception we look to the APA, where Con-

gress exempted from the formal hearing procedures adjudicatory "decisions [that] rest solely on inspections, tests, or elections," 5 U.S.C. § 554(a)(3) (1982), "because those methods of determination do not lend themselves to the hearing process." S.Rep. No. 752, 79th Cong., 1st Sess. 16 (1945). The language of the APA exemption is circumscribed, and does not encompass all decisions which are based on evidence derived from tests or inspections. Were it not so circumscribed, an agency would have unfettered discretion to do away with hearings altogether and replace them with staff inspections as the sole method of developing evidence for its ultimate decision. For example, under such a broad reading, the NRC conceivably could remove safety review of nuclear reactor design from the license hearing by relying solely on tests and inspections to determine that the reactor operates safely. Obviously, the test exemption is not so broad.

In seeking to discern its limits, we look to the legislative history of the APA.[22] There, although Congress did not elucidate its reasoning at length, it cited the Attorney General's report that analyzed the exemption as designed for on the spot decisions made by a qualified inspector who himself "saw ... tested ... or examined" the evidence material to the decision.[23] There is no indication it was meant to apply to decisions that are made by weighing

---

An operating license decision will be stayed by the Commission ... [only] if it determines that it is in the public interest to do so, based on a consideration of the gravity of the substantive issue, the likelihood that it has been resolved incorrectly below, the degree to which correct resolution of the issue would be prejudiced by operation pending review, and other relevant public interest factors. 10 C.F.R. § 2764(f)(2)(i) (1983).

**22.** The major case on the scope of the test exemption, *Door v. Donaldson,* 195 F.2d 764 (D.C. Cir.1952), illuminates only to the extent that it states, in dicta, that the exemption includes "technical facts like the quality of tea or the condition of an airplane as to which administrative hearings have long been thought unnecessary." *Id.* at 766.

**23.** The Attorney General's report stated the following rationale for the test exemption:

The most important element in [a] decision [that falls within the exemption] is the judgment of the man who saw[,] ... tested ... or ... examined [the article to be approved]. Formal proceedings are not, of course, impossible. A trial examiner could be designated; the inspector could be summoned to testify, under oath, concerning his observations.... But resort to formal procedure in this type of administrative matter ... is not desired or utilized ... because it gives no added protection. The judgment would necessarily remain the determining element in the decision, and, in any event, some immediate decision concerning the fitness of an applicant, or of an airplane, or a locomotive, or a ship, is necessary to protect the public interest. Attorney General's Committee on Administrative Procedure, Final Report to the President and to the Congress 37 (1941), *reprinted in* United States Dep't of Justice, Attorney General's Manual on the APA 45 (1947).

evidence tendered by third parties. Where, as with preparedness exercises, the decision involves a central decisionmaker's consideration and weighing of many others persons' observations and first hand experiences, questions of credibility, conflicts, and sufficiency surface and the ordinary reasons for requiring a hearing come into the picture.

■ In light of the scope of the APA's test exemption, we do not believe that evaluations of emergency preparedness exercises fall within the category of determinations that might be excepted from a section 189(a) hearing because they do not lend themselves to the hearing process. In evaluating the exercises, the Commission does more than just review on the scene reports by NRC staff observers. Rather, the Commission is called upon to consider and weigh evidence presented by FEMA, the licensee, and state and local officials as well as its staff in assessing whether the exercises demonstrate that adequate emergency preparedness plans can and will be implemented. In addition, the evaluation of exercises is itself just one, not the "sole," factor in the Commission's overall determination, required under the rule, that, in case of a radiological emergency, there is reasonable assurance that adequate measures can and will be taken to protect the health and safety of the population around a nuclear power plant. Thus, we conclude that evaluation of emergency exercises is not a determination resting solely on a test or inspection so as to qualify for a generic exemption from section 189(a)'s hearing requirement.[24]

**24.** The dissent appears to acknowledge no bounds on the Commission's discretion to remove material determinations from the statutory hearing requirement and classify them as preoperational testing. It unquestioningly accepts the NRC's undocumented position that the emergency exercise should be treated as part of preoperational testing. Diss.Op. at 1454–1455. Under such a standardless rationale, there appears to be nothing to prevent an agency from circumventing a statutory hearing requirement altogether by basing all of its critical determinations on evidence derived from tests and inspections. *See supra* at 1449.

The NRC also argues that Congress has acquiesced in the Commission's longstanding practice of conducting preoperational testing after the licensing hearing, and it now has the discretion to add emergency exercise evaluations to the list of such tests. It refers us to *Power Reactor Development Co. v. International Union of Electrical Workers*, 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961), which involved a challenge to an AEC finding of adequate assurance of safety in a construction permit proceeding. *Power Reactor* read Congress' failure specifically to require the AEC to make a definitive safety finding at the construction permit stage as acquiescence in the Commission's practice of deferring such a safety finding until the licensing stage. *Id.* at 408, 81 S.Ct. at 1535.

We find this acquiescence argument unconvincing for two reasons. First, it deals in the "shaky business [of] attribut[ing] significance to the inaction of Congress." *Id.* at 409, 81 S.Ct. at 1535. Usually, such significance attaches to inaction only where there is evidence that Congress was aware of a problem. *Power Reactor*, for example, involved an issue that had "time and again been brought to the attention of the Joint Committee" which has a special obligation to apprise Congress of the "state of the atomic energy industry." *Id.* at 408, 81 S.Ct. at 1535. Also, the Court noted that the regulation did not infringe on the statutory right to a definitive finding on safety *at a subsequent hearing. Id.* at 411, 81 S.Ct. at 1536. This case is different in both respects.[25]

**25.** The NRC also cites *Public Service Co. v. NRC*, 582 F.2d 77 (1st Cir.), *cert. denied*, 439 U.S. 1046, 99 S.Ct. 721, 58 L.Ed.2d 705 (1978), to support its acquiescence argument. In that case, the First Circuit deemed Congress to have acquiesced in a rule that allowed the NRC to assert jurisdiction over equipment associated with a nuclear reactor (power lines), although there was no evidence that the rule was ever brought to Congress's or the JCAE's attention. Like the rule in *Power Reactor*, however, that rule did not contravene any other clear statutory provision (such as the provision for a hearing on request). Obviously, there can be no general proposition that courts should assume Congres-

Second, even if we were confident Congress had acquiesced in the Commission's practice of conducting posthearing preoperational testing, we would not conclude that its acquiescence covered evaluation of emergency exercises, an issue which has just arisen in the past year. Preoperational testing has traditionally involved testing of reactor systems to ensure that they meet established, objective "acceptance criteria." *See, e.g.,* 10 C.F.R., Part 50, App.J. (Primary Reactor Containment Leakage Testing for Water-Cooled Power Reactors). The licensee conducts the tests and reports the results to the Commission. *Id.* (Section V. Inspection and Reporting of Tests). Assessing these test results falls squarely within the NRC staff's technical expertise. Emergency preparedness exercises, on the other hand, are not evaluated in terms of preestablished criteria; they are evaluated to ensure that they do not reveal any fundamental inadequacies in the nature or implementation capacity of emergency preparedness plans. *See* 10 C.F.R. Part 50, App. E (exercise to test "as much of the licensee, state, and local emergency plans as is reasonably achievable without mandatory public participation"). Exercise evaluations focus on the coordination of police, fire, medical and other service personnel who operate under the auspices of several independent entities—the licensee, utility, county, state and federal governments, even community volunteer agencies. Evaluation of such exercises, insofar as it involves the adequacy of community preparedness plans, will be as much within outside participants' expertise, or that of other federal agencies like FEMA, as within the expertise of the NRC staff. *See, e.g., Metropolitan Edison Co.,* 14 NRC 1211, 1695 (TMI Unit 1 Restart) (team of federal observers from FEMA, EPA, DOE, NRC, FDA, Public Health Service, USDA and DOT reported exercise response deficiencies). We thus find exercise evaluations sufficiently different from traditional preoperational testing to render any inference of congressional acquiescence—even if it were justifiable as to traditional testing—entirely too speculative with respect to emergency preparedness exercises.

CONCLUSION

In order to facilitate licensing of nuclear power plants, and to ensure that emergency preparedness exercises are conducted near enough in time to full power operation to be meaningful, the NRC has ruled that the exercises need not be conducted before the licensing hearing; it still requires, however, that the exercises be conducted and demonstrate adequate assurance of safety before a license will issue. Thus, the NRC has removed from the hearing required by section 189(a) material issues relevant to its licensing decision. On the basis of the statutory language as well as a history of congressional reaction to prior attempts by the Commission to eliminate or significantly restrict the scope of section 189(a) hearings, we find that Congress did not grant the Commission discretion to remove so material an issue as the results of offsite emergency preparedness from required section 189(a) hearings. The adoption of such a rule was beyond NRC's statutory authority; accordingly we vacate the Amendment.

*It is so ordered.*

MacKINNON, Senior Circuit Judge (dissenting):

Section 189(a) of the Atomic Energy Act provides for hearings on the granting of licenses,[1] but the Act delegates to the Nuclear Regulatory Commission (NRC) the responsibility to determine the substantive requirements for licenses. Thus, the scope of Section 189(a) hearings are necessarily

sional acquiescence in all longstanding NRC practices; each case must be decided on its own facts.

**1.** "In any proceeding under this chapter, for the granting ... of any license ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding." 42 U.S.C. § 2239(a)(1) (1976); 42 U.S.C.A. § 2239(a)(1) (West Supp.1983).

determined by the substantive requirements that the Commission's regulations provide are to be considered in connection with any particular license.

Pursuant to Congress' delegation of licensing authority to the NRC, the Commission has by regulation required the preparation of emergency response plans, onsite and offsite, for nuclear power reactors. As petitioner and respondent are agreed, these *plans* will unquestionably be subject to the Section 189(a) hearing requirement. In my view, the majority errs, however, in going further, to require substantially broader hearings. Misapplying Section 189(a), the majority decision effectively *expands* the substantive scope of operating license hearings, by *forcing inclusion of review of the emergency exercises* that the NRC requires later on as part of the final testing process. The ultimate effect of this Court's decision is to intrude upon the Commission's exclusive authority to define the substantive requirements for an operating license.

Under the NRC's rules, prior to issuance of a full power operating license, emergency *plans* must be developed, subject on request to a public hearing, and emergency *exercises* must be conducted later in such a manner as to demonstrate the adequacy of both onsite and offsite emergency plans. The regulatory amendments here in question leave unchanged much of the Commission's basic approach to emergency preparedness. The instant rulemaking does, however, accomplish several changes. First,

the rule significantly revises the substance of the basic finding that the NRC must make as to emergency preparedness. Under the new rule, the NRC's required finding is essentially *predictive* in nature:

> [N]o operating license for a nuclear power reactor will be issued unless a finding is made by NRC that there is *reasonable assurance that adequate protective measures can and will be taken* in the event of a radiological emergency.

10 C.F.R. § 50.47(a)(1) (1983); 47 Fed.Reg. 30232, 30235 (July 13, 1982) (emphasis added); *see* 47 Fed.Reg. at 30233 (NRC's discussion of final rule, describing "predictive finding").[2] Second, the Commission provides that low power licenses require only adequate *onsite* emergency plans; no offsite showing is required for fuel loading and low power operation. *See* 10 C.F.R. § 50.47(d); 47 Fed.Reg. at 30232–33.[3] Finally, the regulation makes it clear that only the *plans* for onsite and offsite emergency responses are subject to Section 189(a) hearing requirements. *See* 10 C.F.R. § 50.47(a)(2); 47 Fed.Reg. at 30233. Thus, just as for the final *inspection and pre-operational testing* of the plant, no initial hearing rights attach to review of the results of required emergency exercises. The initial formal hearings concerning licensing authorization will not embrace the exercise or final testing results, although the Commission may in its discretion allow for such an expansion of hearings after exercises have been conducted. Beyond this possibility, according to the NRC, a

---

**2.** The language of the prior standard placed a greater emphasis on the *actual level of readiness* for emergencies:

> No operating license for a nuclear power reactor will be issued unless a finding is made by NRC that the *state of onsite and offsite emergency preparedness provides reasonable assurance that adequate protective measures can and will be taken* in the event of a radiological emergency.

10 C.F.R. § 50.47(a)(1) (superceded); 45 Fed. Reg. 55402, 55409 (Aug. 19, 1980) (emphasis added). This significant change in the relevant substantive standard might obviously have a substantial effect on the scope of Section 189(a) hearings. Yet the majority opinion fails adequately to recognize this change in the nature of

the requisite emergency preparedness finding. Much of petitioner's brief is devoted to attacking the factual basis for the Commission's determinations that a predictive finding is sufficient to fulfill its regulatory responsibilities, and that that predictive finding can be made prior to conduct of exercises. The majority does not directly question the rule's change in the required substantive finding. In my view, however, the ultimate effect of the majority's decision is to undermine the Commission's decision to modify the *substance* of its licensing requirement as to emergency preparedness.

**3.** Petitioner does not challenge this aspect of the rule amendment. *See* Brief for Petitioner at 4–5.

hearing may be held only upon a motion by a party to reopen a concluded licensing hearing, or in conjunction with a well-grounded petition under 10 C.F.R. § 2.206 to modify, suspend, or revoke a license. *See* 47 Fed.Reg. at 30233.

I would uphold this rulemaking. The Commission's determination that the results of emergency exercises may not be injected into the Section 189(a) licensing hearings is entirely consistent with the predictive nature of the emergency preparedness finding that the NRC has bound itself to make, and does not conflict with the statutory hearing requirement. It is my view that in reviewing the NRC's rule, we should not apply an overly literal interpretation to Section 189(a), against the basic legislative intent expressed throughout the statute. A statute is to be read in its entirety, and as Judge Learned Hand once observed, "[t]here is no surer way to misread any document than to read it literally ...." *Guiseppi v. Walling,* 144 F.2d 608, 624 (2d Cir.1944) (L. Hand, J., concurring). And to this should be added that a sentence of an act should rarely be read literally against the intent that permeates the rest of an act. As we observed concerning the broad congressional intent expressed in the Atomic Energy Act:

Congress ... enact[ed] a regulatory scheme which is virtually unique in the degree to which broad responsibility is reposed in the administering agency, *free of close prescription* in its charter as to how it shall proceed in achieving the statutory objectives.

*Siegel v. Atomic Energy Commission,* 400 F.2d 778, 783 (D.C.Cir.1968) (citing *Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers,* 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961)) (emphasis added). The specific language of Section 189(a) should not be applied contrary to the context of the Act to bring about more than is required by that section or by the statute as a whole.

Mindful of its tremendous safety responsibilities under the Atomic Energy Act, the Commission has been extremely vigilant in requiring and updating very substantial safety measures to deal with the potential of radiological emergencies. The NRC's existing emergency preparedness regulations are a good example. The Commission, in order to ensure that adequate plans exist to deal with emergencies, both onsite and offsite of nuclear plants, has promulgated sixteen specific standards that emergency response plans must meet.[4] Some of

---

**4.** 10 C.F.R. § 50.47(b) provides:

(b) The onsite and, except as provided in paragraph (d) of this section, offsite emergency response plans for nuclear power reactors must meet the following standards: *

(1) Primary responsibilities for emergency response by the nuclear facility licensee and by State and local organizations within the Emergency Planning Zones have been assigned, the emergency responsibilities of the various supporting organizations have been specifically established, and each principal response organization has staff to respond and to augment its initial response on a continuous basis.

(2) On-shift facility licensee responsibilities for emergency response are unambiguously defined, adequate staffing to provide initial facility accident response in key functional areas is maintained at all times, timely augmentation of response capabilities is available and the interfaces among various onsite response activities and offsite support and response activities are specified.

(3) Arrangements for requesting and effectively using assistance resources have been made, arrangements to accommodate State and local staff at the licensee's nearsite Emergency Operations Facility have been made, and other organizations capable of augmenting the planned response have been identified.

(4) A standard emergency classification and action level scheme, the bases of which include facility system and effluent parameters, is in use by the nuclear facility licensee, and State and local response plans call for reliance on information provided by facility licensees for determinations of minimum initial offsite response measures.

(5) Procedures have been established for notification, by the licensee, of State and local response organizations and for notification of emergency personnel by all organizations; the content of initial and followup messages to response organizations and the public has been established; and means to provide early notification and clear instruction to the populace within the plume exposure pathway

these standards involve highly technical evaluations and require minute knowledge of the operation of nuclear power plants. There can be no doubt that the NRC, in promulgating these standards, has faithfully carried out its duty to ensure the safety of the public.

The questions before this Court, of course, do not involve all of these standards, but rather revolve around the singular (b)(14) requirement of emergency preparedness exercises. The nub of this case is whether review of the results of these exercises must be included within public hearings under Section 189(a). In essence, the Union of Concerned Scientists is attempting to compel the Commission to change its regulations so that the emergency *exercises* will be treated as part of a licensing proceeding that may be subjected to a hearing, rather than as part of the final pre-operational testing. Thus, petitioner seeks to inject the results of exercises into the formal hearing process. This effort is inconsistent with the Commission's substantive determination that the

required finding as to emergency preparedness is predictive in nature.

In this rule, the NRC in the exercise of the judgment conferred upon it by the statute, has sought to treat compliance with these exercise requirements on the same basis as it does its pre-operational tests of the plant itself. The two are very similar in nature and go hand-in-hand. The Atomic Energy Act has never been interpreted to require hearings on the results of the final preoperational tests. This interpretation of an Act which was first adopted in 1946, and the subsequent agency practice in an area over which Congressional oversight has been at its zenith, should not be ignored. Hearings inevitably involve considerable delays, which can be extremely costly, especially as the plant nears complete readiness for full power operation, and as all employees necessary to start operations are employed and on duty. The NRC has concluded, quite sensibly in my view, that exercises conducted to test emergency plans, which are coordinated with public participation, would best be conducted

Emergency Planning Zone have been established.

(6) Provisions exist for prompt communications among principal response organizations to emergency personnel and to the public.

(7) Information is made available to the public on a periodic basis on how they will be notified and what their initial actions should be in an emergency (e.g., listening to a local broadcast station and remaining indoors), the principal points of contact with the news media for dissemination of information during an emergency (including the physical location or locations) are established in advance, and procedures for coordinated dissemination of information to the public are established.

(8) Adequate emergency facilities and equipment to support the emergency response are provided and maintained.

(9) Adequate methods, systems, and equipment for assessing and monitoring actual or potential offsite consequences of a radiological emergency condition are in use.

(10) A range of protective actions have been developed for the plume exposure pathway EPZ for emergency workers and the public. Guidelines for the choice of protective actions during an emergency, consistent with Federal guidance, are developed and in place, and protective actions for the ingestion exposure pathway EPZ appropriate to the locale have been developed.

(11) Means for controlling radiological exposures, in an emergency, are established for emergency workers. The means for controlling radiological exposures shall include exposure guidelines consistent with EPA Emergency Worker and Lifesaving Activity Protective Action Guides.

(12) Arrangements are made for medical services for contaminated injured individuals.

(13) General plans for recovery and reentry are developed.

(14) Periodic exercises are (will be) conducted to evaluate major portions of emergency response capabilities, periodic drills are (will be) conducted to develop and maintain key skills, and deficiencies identified as a result of exercises or drills are (will be) corrected.

(15) Radiological emergency response training is provided to those who may be called on to assist in an emergency.

(16) Responsibilities for plan development and review and for distribution of emergency plans are established, and planners are properly trained.

\* These standards are addressed by specific criteria in NUREG–0654; FEMA–REP–1 entitled "Criteria for Preparation and Evaluation of Radiological Emergency Response Plans and Preparedness in support of Nuclear Power Plants—for Interim Use and Comment", January 1980.

close to the pre-operational testing of the plant itself.[5] They both fit into the same regulatory scheme and require that plant operating personnel be on station.

The NRC's regulation does not exclude the interested public from participating in the process of developing emergency preparedness. Far from it—the overall procedures set forth by the Commission envision public participation at a number of different stages. First, the public has a role in actually formulating emergency plans, insofar as state and local governments must be involved in generating such plans, in coordination with the planning of the operator. Second, the basic plans for emergency responsiveness at any plant, concerning both onsite and offsite readiness, are subject to full hearings at the request of any interested person at the formal licensing stage. *See supra.* Third, when the plans are subsequently tested, the public participates in the exercises themselves. Fourth, the Federal Emergency Management Agency (FEMA) participates as an outside expert in the evaluation of the emergency exercises, and thereby has a role in guaranteeing that preparedness is adequate and that serious deficiencies will not be overlooked. *See* 10 C.F.R. § 50.47(a)(2); 47 Fed.Reg. at 30235–36. Finally, in the event that such deficiencies develop through the results of the exercises, the Commission assures that a previously concluded hearing could be reopened at the request of a party. *See* 47 Fed.Reg. at 30233. Thus, a hearing is not foreclosed in a proper case.

That this final possibility for reopening of a public hearing poses a somewhat higher entry standard for would-be litigants is not disconcerting. A higher threshold is justified in view of the extensive prior consideration and evaluation of the actual exercises to which emergency plans will have been subjected. Minor complaints should not be encouraged, particularly at this late stage, because of the tremendous delay and the enormous cost that they can occasion—up to two years in cases where the Commission's decisions are appealed to courts.[6] In practice, if petitioners prevail, it will be necessary—unless very substantial delay in the opening of full power operation is to result—to move up the emergency testing exercises, removing them further from the opening of plant operation. In such event, not only would the exercises themselves be less valuable, but this shift would also require preliminary employment of full operating personnel for a longer period, with an attendant substantial increase in the costs of bring-

5. Concerning this point, the majority reads this opinion far too broadly. *See* Majority Opinion at 1450, n. 24. Contrary to the majority's suggestions, I would not allow the NRC unbounded authority to replace all hearings with tests and inspections. This opinion is of course limited to the facts of this case, and to the NRC's particular rulemaking here under review—an administrative action which in my view is an entirely reasonable exercise of the Commission's broad statutory authority.

6. The majority suggests that delays and associated costs may be partly reduced by various methods of expediting hearings. Majority Opinion at 1448–49, n. 21. I am of the firm opinion, however, that this Court's decision today—notwithstanding the majority's rather unrealistic reliance on so-called expediting procedures, which are largely untested and unproven—will result in substantial delays and costs. Such judicially-imposed delays are endemic in attempts to bring nuclear power projects into operation. *See, e.g., People Against Nuclear Energy v. United States Nuclear Regulatory Comm'n,* 678 F.2d 222 (D.C.Cir.1982), *rev'd sub. nom. Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 103 S.Ct. 1556, 75 L.Ed.2d 534 (1983); *Porter County Chapter of the Izaak Walton League of America, Inc. v. Nuclear Regulatory Comm'n,* 606 F.2d 1363, 1366 & n. 5–6 (D.C.Cir.1979). Delays in this area are so numerous and so costly that the public will be paying billions of dollars for years to come. A very recent editorial addresses the tremendous cost of the numerous delays in the construction of nuclear power plants in the United States. Navarro, *Seabrook Failure: Only in America,* N.Y. Times, May 15, 1984, at A29, col. 1. Focusing on the example of the Seabrook, New Hampshire, nuclear plant, the author points out that construction delays for years through protracted legal interventions, effective obstruction of its licensing process, and other related delays, has substantially increased both interest charges and construction costs on the plant—to the extent that the total cost has soared to around $6 billion. The same plant could have been built in France for one-sixth the cost. *Id.*

ing a plant into operation. These are very serious impracticalities, to which the NRC has given close attention in choosing an alternative course. The Commission has no mandate to construe its charter statute so as to maximize the delay in its administration. Accordingly, I must dissent from the Court's decision in this case.