868 F.2d 810
 57 USLW 2459, 98 P.U.R.4th 529
 STATE OF OHIO, ex rel. Anthony J. CELEBREZZE, Jr.,
(86-4107); Toledo Coalition for Safe Energy, an
association; Susan A. Carter,
(86-4085), Petitioners,
v.
NUCLEAR REGULATORY COMMISSION and the United States of
America, Respondents,
The Toledo Edison Company and Cleveland Electric
Illuminating Company, Intervenors.
 Nos. 86-4085, 86-4107.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 23, 1987.
Decided Jan. 27, 1989.
As Amended March 10, 1989.
 
 Terry J. Lodge (argued), Toledo, Ohio, David Northrop and Sharon Sigler, Asst. Attys. Gen., Columbus, Ohio, for petitioners.
 Carole F. Kagan (argued), L. Slaggie, James M. Taylor, Director, Office of Inspection & Enforcement, U.S. Nuclear Regulatory Comm., William Briggs, Dick Thornburgh, U.S. Atty. Gen., U.S. Dept. of Justice, Washington, D.C., for respondents.
 
 
 1
 Jay Silberg (argued), Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for intervenor utilities.
 
 
 2
 Carole F. Kagan (argued), William Briggs, E. Leo Slaggie, Office of Gen. Counsel, Nuclear Reg. Comm., Washington, D.C., for Nuclear Regulatory Com'n.
 
 
 3
 Dirk D. Snel, U.S. Dept. of Justice, Washington, D.C., for U.S.
 
 
 4
 Jay Silberg (argued), Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for Cleveland Elec. Illuminating Co.
 
 
 5
 Douglas O. Meyer, Ottawa County Pros. Atty., Port Clinton, Ohio, for amicus curiae Ottawa County in support of respondents.
 
 
 6
 Gary M. Orlow, Toledo, Ohio, for Lucas County in support of respondents.
 
 
 7
 Before ENGEL, Chief Judge*; BOGGS, Circuit Judge; and HILLMAN,** Chief District Judge.
 
 
 8
 ENGEL, Chief Judge.
 
 
 9
 In October 1986, the Toledo Coalition for Safe Energy and the State of Ohio each petitioned the Nuclear Regulatory Commission [NRC] for a hearing to suspend operation of Davis-Besse Nuclear Power Station [Davis-Besse] due to the alleged inadequacies of that facility's emergency preparedness plan. In November 1986, the Director of the NRC Office of Inspection and Enforcement [Director] denied both petitions. Petitioners now seek our review of the Director's decision to deny a hearing. Since both petitioners raise similar issues, their cases have been consolidated on appeal.
 
 
 10
 Whether the Director's decision is reviewable at all is a matter of initial uncertainty. The Director asserts that his decision to deny the requested hearing is a determination committed to his sole discretion in enforcing the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A) (1982). Since this issue has not yet been resolved by the Supreme Court, we follow the path taken by the D.C. Circuit in Lorion v. United States Nuclear Regulatory Commission, 785 F.2d 1038 (D.C.Cir.1986), and adopted by our court in Dickinson v. Zech, 846 F.2d 369 (6th Cir.1988), and avoid deciding whether the Director's decision is reviewable by addressing first the easier question of whether the Director's decision was a proper exercise of his discretion. We conclude that petitioners have failed to demonstrate that the Director acted arbitrarily or capriciously in denying their request for further proceedings and affirm the Director's decision.
 
 I. THE FACTS
 
 11
 The Davis-Besse Nuclear Power Station is a commercial nuclear power plant located approximately twenty-five miles east of Toledo, Ohio. In 1971, the Atomic Energy Commission issued a permit authorizing the construction of the facility. Construction was completed and an operating license was issued by the NRC in 1977. Although the facility began commercial operation producing electricity in 1978, the plant was temporarily shut down following a loss of feedwater on June 9, 1985. After reviewing the facility's design, the NRC Commissioners authorized the restart of Davis-Besse on November 21, 1986. In October 1986, both petitioners in this case, The Toledo Coalition for Safe Energy and the State of Ohio, filed petitions with the NRC pursuant to 10 C.F.R. Sec. 2.206 to suspend or terminate the Davis-Besse license and to issue an order prohibiting restart of Davis-Besse.
 
 
 12
 In their petitions, both parties cited several deficiencies in the emergency plan for Davis-Besse. The most notable of these flaws were that the Federal Emergency Management Agency [FEMA] had not formally approved the emergency plan; that the governor, an original drafter of the plan, had withdrawn his support; that the plan failed to include a portion of Lucas County within the Emergency Planning Zone (EPZ), even though it was within a ten mile radius of the plant; and finally that the NRC had failed to address the problems posed by a resolution of school union members, particularly bus drivers, not to participate in the planning or evacuation in the event of a nuclear disaster. Petitioners also requested that NRC keep Davis-Besse from operating pending resolution of the alleged deficiencies.
 
 
 13
 On November 19, 1986, the Director of the NRC Office of Inspection and Enforcement denied both petitions based on interim agreements reached with regard to all alleged deficiencies, and based also on FEMA's informal indication that the plan was adequate. The Director's decision became final twenty-five days later when the Commission chose not to review it. See 10 C.F.R. Sec. 2.206(c) (1988). Davis-Besse commenced restart as scheduled. By January 1987, shortly before oral argument, Davis-Besse was in its power ascension phase and operating at 38% of full power.
 
 
 14
 In November 1986, both petitioners filed petitions for review of the NRC's denial of their petitions and emergency motions to stay restart of Davis-Besse. On December 12, 1986, our court denied petitioners' stay request, but directed the clerk to set an accelerated briefing schedule on the petitions for review. On appeal, petitioners reassert the alleged deficiencies in Davis-Besse's emergency plan and contend that the Director acted arbitrarily and capriciously in refusing to institute the requested show cause proceedings under section 2.206.
 
 II. REVIEWABILITY
 
 15
 The adequacy of safety plans at nuclear power facilities is a serious matter, and the nuclear accidents at Three Mile Island and later at Chernobyl in the Soviet Union bear witness to the importance of adequate emergency preparedness plans. Nevertheless, Congress has recognized the highly technical nature of such regulations and has accordingly circumscribed the power of the courts both to review and to overturn decisions made by the NRC. As the Supreme Court has noted, "the Commission is making predictions, within its area of special expertise, at the frontiers of science. When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential." Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983) (citations omitted).
 
 
 16
 Although the Supreme Court has not directly spoken on the power of federal courts to review the NRC Director's determinations under the Atomic Energy Act, the Court did confront a somewhat analogous issue in Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). The plaintiffs in Heckler sought review of a Food and Drug Administration [FDA] decision not to take enforcement action with regard to the administration of a death penalty drug, alleging that use of the drug violated various sections of the Food, Drug, and Cosmetic Act [FDCA]. The Court ultimately concluded that since the language of the FDCA provided no "law to apply" in reviewing the limits of the FDA's broad enforcement discretion, the presumption that an agency's refusal to take enforcement action is judicially immune was not rebutted. Id. at 834-38, 105 S.Ct. at 1657-59. "[E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Id. at 830, 105 S.Ct. at 1655. The Supreme Court has not yet addressed the question presented in this case, however, where the only "law to apply" in reviewing an agency's refusal to take enforcement action is not found in the governing statute, but in the agency's own regulations.
 
 
 17
 The parties here have argued this reviewability issue at length. Since the issue is indeed complex and since we are without any clear Supreme Court guidelines in resolving it, we follow the lead set by the D.C. Circuit in Lorion v. United States Nuclear Regulatory Commission, 785 F.2d 1038, and consider first the merits of petitioners' claim. See also Dickerson v. Zech, 846 F.2d 369 (6th Cir.1988). Lorion involved a similar challenge to the NRC Director's refusal to institute section 2.206 proceedings. After concluding that the NRC Director had not abused his discretion, the D.C. Circuit found no need to resolve the much knottier reviewability question:
 
 
 18
 Even though it is a "threshold" question, the court need not plumb the intricacies of this reviewability conundrum in the instant case. The merits of Lorion's underlying claims are sufficiently clear that we can and should avoid the potentially far-reaching questions on the scope of Chaney. The decision to avoid a difficult threshold question and resolve the substantive dispute is not new; both the Supreme Court and this court have used the procedure to restrict cases to their narrowest possible holding, particularly when the threshold question involves important constitutional or public policy issues.
 
 
 19
 785 F.2d at 1041.
 
 III. THE MERITS
 A. The Applicable Statute and Regulations
 
 20
 Congress has established an extensive statutory structure for the review of nuclear power facilities, beginning with the Atomic Energy Act of 1954, 42 U.S.C. Sec. 2011 et seq. (1982), and followed by the amendments in the Energy Reorganization Act of 1974, 42 U.S.C. Sec. 5801 et seq. (1982). Under these statutes, the Nuclear Regulatory Commission is delegated primary authority in regulating the safety of nuclear plants through licensing and other procedures. In fact, the D.C. Circuit has noted that the Atomic Energy Act of 1954 creates "a regulatory scheme which is virtually unique in the degree to which broad responsibility is reposed in the administrative agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives." Siegel v. Atomic Energy Commission, 400 F.2d 778, 783 (D.C.Cir.1968).
 
 
 21
 Consistent with its statutory mandate and a subsequent recommendation by a Presidential Commission following the Three Mile Island disaster, the NRC promulgated rules requiring each state and county located within a ten mile radius of each nuclear power facility to submit an off-site emergency preparedness plan which would ensure that in the event of a nuclear accident, information could be disseminated rapidly and the endangered populations would be evacuated or otherwise protected. 10 C.F.R. Sec. 50.47(b) & app. E (1988). The responsibility for evaluating and approving the plans is shared between the Federal Emergency Management Agency (FEMA) and the NRC, see Memorandum of Understanding, 45 Fed.Reg. 82,713 (1980), but final decision-making authority on a plan's adequacy rests with the NRC.
 
 
 22
 Detailed regulations set forth the required procedures which must be followed by both FEMA and the NRC in reviewing a plan for plants not yet licensed or in operation, see 10 C.F.R. Sec. 50.47 & app. E, and for plants already in operation at the time the regulation was promulgated, see 10 C.F.R. Sec. 50.54(s) (1988). However, since Davis-Besse was an operating plant well before the regulations were promulgated in 1981, the rules governing operating plants set forth at section 50.54(s) apply. Section 50.54(s) provides in part:
 
 
 23
 (2)(ii) If after April 1, 1981, the NRC finds that the state of emergency preparedness [submitted by a licensee authorized to possess and/or operate a nuclear power reactor] does not provide reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency (including findings based on requirements of Appendix E, Section IV.D.3 ) and if the deficiencies (including deficiencies based on requirements of Appendix E, Section IV.D.3 ) are not corrected within four months of that finding, the Commission will determine whether the reactor shall be shut down until such deficiencies are remedied or whether other enforcement action is appropriate. In determining whether a shutdown or other enforcement action is appropriate, the Commission shall take into account, among other factors, whether the licensee can demonstrate to the Commission's satisfaction that the deficiencies in the plan are not significant for the plant in question, or that adequate interim compensating actions have been or will be taken promptly, or that that [sic] there are other compelling reasons for continued operation.
 
 
 24
 (3) The NRC will base its finding on a review of the FEMA findings and determinations as to whether State and local emergency plans are adequate and capable of being implemented, and on the NRC assessment as to whether the licensee's emergency plans are adequate and capable of being implemented. Nothing in this paragraph shall be construed as limiting the authority of the Commission to take action under any other regulation or authority of the Commission or at any time other than that specified in this paragraph.
 
 
 25
 Unlike its counterpart for new unlicensed plants, see 10 C.F.R. 50.47(a) (1988), this regulation does not appear to require formal FEMA approval of a plan prior to the NRC's approval.[1] See also infra section III.B. In all other ways, the guidelines for operating plants appear identical to those for new plants. Both regulations allow the Director considerable latitude in identifying and in acting on significant deficiencies in the plan. Once the Director has determined that a significant deficiency exists, he may choose any of a number of unspecified enforcement paths, including allowing the plant to continue in operation provided he is satisfied that interim measures are sufficient. Both sections also allow the Director to determine whether a plan is adequate, but the time scale for when such adequacy must be attained is discretionary, since the regulations require that the Director need only have "reasonable assurance" that a plan is "capable of being implemented." 10 C.F.R. Sec. 50.54(s)(3) (emphasis supplied). See Union of Concerned Scientists v. United States Nuclear Regulatory Commission, 735 F.2d 1437, 1452 (D.C.Cir.1984) ("Under [section 50.47(a)(1) ], the NRC's required finding is essentially predictive in nature").
 
 
 26
 The NRC's implementation of its emergency plan provision can be challenged throughout the licensing process, but a hearing is only mandatory before a construction permit is issued. 42 U.S.C. Sec. 2239(a)(1) (1982 & Supp.1988). After a permit and an operating license have been issued, petitions for further proceedings "to modify, suspend, or revoke a license, or for such other action as may be proper" are granted at the discretion of the Director. 10 C.F.R. Sec. 2.206(a) (1988). The regulations provide no indication of the standards under which a section 2.206 request is considered, but the courts have universally interpreted the regulations to afford the Director broad discretion in his decision to deny a section 2.206 petition. See, e.g., Union of Concerned Scientists, 735 F.2d at 1444 n. 11; Rockford League of Women Voters v. United States Nuclear Regulatory Commission, 679 F.2d 1218, 1223 (7th Cir.1982) ("Our job is to assure that the Commission complies with the specific statutes and regulations applicable to its regulatory activities.... Beyond that our power to review an agency's decision not to initiate a proceeding is extremely limited. We would exercise it only if we were strongly convinced that the Commission was inexcusably defaulting on its fundamental responsibility to protect the public safety from nuclear accidents.").
 
 
 27
 Assuming for the sake of an expedited analysis that the Director's decision to deny petitioners' request for a hearing in the present case is reviewable, the standard for review is the familiar "arbitrary and capricious" standard. Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A) (1982). A careful examination of each of petitioners' claims satisfies us that the Director's actions were within the bounds of his discretion. Each of petitioners' claims will be considered in detail below.
 
 B. Procedural Violations
 
 28
 One of petitioners' primary allegations is that FEMA's failure formally to approve the emergency plan for Davis-Besse attests to its inadequacy. More specifically, petitioners point to 10 C.F.R. Sec. 50.54(s)(3) requiring that the NRC must base its reasonable assurance conclusion on FEMA findings.[2] Thus, it is argued, operation of a facility without a formally approved plan violates NRC regulations.
 
 
 29
 On a purely factual level, NRC concedes that the Davis-Besse emergency preparedness plan did not receive FEMA's formal approval. However, formal approval is not required. 10 C.F.R. Sec. 50.54(s)(3) makes no reference to "formal approval" as a condition for a NRC determination of reasonable assurance. That section requires only that the NRC "base its finding on a review of the FEMA findings and determinations as to whether State and local emergency plans are adequate and capable of being implemented." In contrast, section 50.47(a)(2) indicates that "[i]n any NRC licensing proceeding, a FEMA finding will constitute a rebuttable presumption on questions of adequacy and implementation capability." The record reveals, in fact, that FEMA did provide an indication of its informal approval of the plan which would appear to satisfy section 50.54(s)(3). In a July 23, 1986 letter from FEMA to NRC, FEMA acknowledged that although it had not yet formally reviewed and approved the Davis-Besse plan, it had observed that the licensee and government officials were cooperating in correcting deficiencies previously identified. The letter also established that FEMA would provide the NRC with status updates through March 1987.
 
 
 30
 Our interpretation of the less procedurally restrictive section 50.54(s)(3) is further supported by the general history of the emergency planning regulations. In its discussion of the content of the proposed regulations, the NRC stated that "there is no legal requirement that a State or local government submit its plan to FEMA for review, and FEMA's failure to approve such plan is not accompanied by any sanction or refusal to accord a benefit." Proposed Rule, 45 Fed.Reg. 36,386, 36,387 (1982).
 
 
 31
 In summary, it is clear that section 50.54(s)(3) does not require formal FEMA approval for operating plants. To the extent that some FEMA findings may be required under law, such a requirement has been satisfied in the present case since FEMA has concluded that the plan for Davis-Besse demonstrates an adequate level of emergency preparedness planning. In any case, under the applicable section 50.54(s) the responsibility for making final determinations on the adequacy of off-site emergency preparedness plans rests with the NRC. That section specifically provides: "Nothing in this paragraph shall be construed as limiting the authority of the Commission to take action under any other regulation or authority of the Commission or at any time other than that specified in this paragraph." See also 44 C.F.R. Sec. 350.3(e) (1987) (supporting NRC's view that it can make determinations of reasonable assurance and issue operating license without formal FEMA approval).
 
 C. Substantive Deficiencies
 
 32
 Petitioners also charge the NRC with violating its own regulations by approving a plan with numerous substantive deficiencies.
 
 1. Withdrawal of Gubernatorial Support
 
 33
 FEMA regulations require the individual state to initiate formal review of state or local emergency plans. 44 C.F.R. Sec. 350.7(d) (1987) provides that the application for approval
 
 
 34
 shall contain a statement that the State plan, together with the appropriate local plans, is, in the opinion of the State, adequate to protect the public health and safety of its citizens living within the emergency planning zones for the nuclear power facilities included in the submission by providing reasonable assurance that State and local governments can and intend to effect appropriate protective measures offsite in the event of a radiological emergency.
 
 
 35
 Both parties are again in agreement on the facts. In February 1981, the State of Ohio submitted its plan to FEMA, and on August 15, 1986, the governor formally withdrew his support.
 
 
 36
 Nevertheless, in refusing petitioners' request for a hearing, the Director concluded that despite the withdrawal of gubernatorial support, the State was continuing "to work actively and cooperatively in the development of emergency preparedness planning and exercises." Although Ohio's withdrawal of support must necessarily be a matter of serious concern, the NRC's conclusion to proceed is supported by a close examination of the record. Specifically, the issues of greatest importance to the Governor were those which could be resolved following further study and were not serious flaws making implementation of the plan impossible. Exactly such problems are contemplated by the regulations without necessitating a formal hearing. For example, 44 C.F.R. Sec. 350.14 (1987) allows the State to amend its plan at any time during the review process or even after formal FEMA approval. Since the NRC has provided a means for continuous state input, it is clear that a state's subsequent withdrawal of support does not automatically invalidate an existing plan or mandate a public hearing on whatever issues the state considers important. Such a possibility would substantially impair NRC's statutorily defined role as the ultimate adjudicator of the adequacy of emergency plans.
 
 
 37
 2. Lack of Inclusion of Jerusalem Township (Lucas County) in the Emergency Plan
 
 
 38
 Petitioners also argue that NRC's failure to include Jerusalem Township, an area located within a ten mile radius of Davis-Besse, in the plan constituted a violation of the regulations since 10 C.F.R. Sec. 50.54(s)(1) (1988) requires the licensee to submit a plan for the plume exposure pathway Emergency Planning Zone (EPZ) which "[g]enerally ... shall consist of an area about 10 miles (16 km) in radius."
 
 
 39
 Petitioners are again correct on the facts. On December 7, 1981, FEMA informed the state that a separate Lucas County plan was required because portions of the county were located within ten miles of Davis-Besse. FEMA then proceeded to place its review of Davis-Besse on hold pending submission of a Lucas County plan. On December 9, 1985, Lucas County still lacked a plan, and FEMA threatened to disapprove the state plan because of this inadequacy. Apparently prompted by FEMA's ultimatum, on April 28, 1986, the Lucas County Commissioners voted to have an emergency plan prepared, and a letter was sent by the Ohio Disaster Services Agency to FEMA in July stating milestones and completion dates for the Lucas County plan. At the time the petitions were filed in November, however, the plan had not yet been completed but was still in the process of being tested.
 
 
 40
 In its response to petitioners, the NRC Director conceded this incompleteness, but maintained that progress on the plan was sufficient to provide reasonable assurance that the planning deficiencies would be corrected in an acceptable manner:
 
 
 41
 In practice, radiological emergency response plans are rarely if ever perfect and complete. This is the reason for the continuing FEMA and NRC oversight of this area. Deficiencies will be found and assessed for significance. While all deficiencies are expected to be corrected, not all will change a finding of reasonable assurance by the NRC....
 
 
 42
 Specifically, as described above, interim measures have been implemented and the schedule for completion has been approved by FEMA and has been met to date. With respect to other deficiencies noted during exercises conducted at Davis-Besse, these have been of minor significance and either have been or are being corrected.
 
 
 43
 The Director's response, coupled with the language of the relevant regulations discussed below, provide clear support for our conclusion that the Director was acting within the bounds of his discretion in denying petitioners' request.
 
 
 44
 First, the regulation requiring a plume exposure pathway Emergency Planning Zone (EPZ) is vague with regard to the specific area covered. The EPZ requirement describes the zone only approximately ("about") in which "[t]he exact size and configuration of the EPZs ... shall be determined in relation to local emergency response needs and capabilities...." 10 C.F.R. Sec. 50.54(s)(1) (1988). Second, and perhaps more compelling, is the fact that even if NRC finds the emergency preparedness plan inadequate, it has the sole discretion to determine the appropriate action by "tak[ing] into account, among other factors, whether the licensee can demonstrate to the Commission's satisfaction that the deficiencies in the plan are not significant for the plant in question, or that adequate interim compensating actions have been or will be taken promptly." 10 C.F.R. Sec. 50.54(s)(2)(ii) (1988). Based on these guidelines, we conclude that the Director did not act arbitrarily and capriciously in finding that the scheduled deadlines set by the Ohio Disaster Services Agency provided reasonable assurance that Lucas County would be included in the emergency preparedness plan.[3]
 
 3. The Bus Driver Resolution
 
 45
 Petitioners also argue that a union resolution by school bus drivers not to participate in the event of a radiological emergency was a serious inadequacy in the plan, making it uncertain whether evacuation could be carried out successfully. In his decision the Director concluded that the bus driver resolution did not substantially threaten the adequacy of the plan, since FEMA had characterized the drivers' resolution as nonbinding and had further indicated that measures were being taken to resolve the union's remaining problems to ensure their full participation in the plan. "In FEMA's view the union members are willing to cooperate, attend meetings and participate in training related to their emergency duties."
 
 
 46
 The Director's conclusion on this issue is supported not only by FEMA's findings, but by the planning standards set forth at 10 C.F.R. Sec. 50.47. Although this section lists a variety of protective actions to be included for the plume exposure pathway EPZs, including evacuation planning, it fails to set forth any specific requirements, particularly with regard to the issue of driver availability. Cf. San Luis Obispo Mothers for Peace v. NRC, 789 F.2d 26, 44 (D.C.Cir.1986) ("Because the NRC was not required by its regulations to consider the potential complication effects of earthquakes on emergency planning in its decision to license ... there is no merit to petitioners' claim that they were denied a hearing on the issue"). Additionally, the regulations advise the NRC to defer to FEMA findings on points within its expertise, which the Director did in this instance. Since NRC and FEMA were closest to the threatened strike, and since the agency is to be afforded broad discretion, we abide by the Director's decision. The Second Circuit in County of Rockland v. NRC, 709 F.2d 766, 776-77 (2d Cir.1983), reached a similar conclusion in holding that NRC's refusal to take enforcement action on the bus drivers' threatened lack of cooperation was not improper.
 
 
 47
 In summary, although this issue has been troubling to us, based on the Director's findings and the language of the regulations, we conclude that the Director did not act arbitrarily or capriciously in denying the request for further proceedings. A contrary ruling on our part might be construed as holding that a resolution by possible participants not to participate in an emergency plan amounts to mandatory grounds for granting section 2.206 requests. While we do not hold that such a circumstance can never be the basis for finding the existence of an abuse of discretion, certainly such an abuse is not suggested by the showing made here in support of the request for a hearing.
 
 
 48
 4. Other, "Outstanding Issues" raised by Ohio
 
 
 49
 In its petition the State of Ohio noted that it was continuing to examine sixteen issues of concern in Davis-Besse's emergency plan, but failed to identify any of the issues. The Director responded that Ohio's lack of specificity with regard to the nature of the issues made it impossible for the NRC to address the problems, and based his denial on petitioner's own failure to satisfy the relevant regulation. See 10 C.F.R. Sec. 2.206 (requiring petitioner to "set forth the facts that constitute the basis for the request."). As the Director noted, petitioners are not prevented from raising these issues altogether, since they may submit a second 2.206 petition.
 
 IV. CONCLUSION
 
 50
 We conclude that the Director did not abuse his discretion in denying petitioners' requests for further proceedings on the adequacy of Davis-Besse's emergency preparedness plan. It is well settled that the NRC is granted broad discretion in its consideration of section 2.206 petitions. In Seacoast Anti-Pollution League of New Hampshire v. NRC, 690 F.2d 1025, 1034 (D.C.Cir.1982), the D.C. Circuit concluded that because the Commission was not required to take action, its refusal to institute proceedings did not violate any statute or regulation, especially where its decision had a "reasoned basis supported by law." Similarly, in County of Rockland v. NRC, 709 F.2d at 777, the Second Circuit held that petitioners offered "no convincing evidence to discredit the factual findings and conclusion reached by the Commission" in their request alleging that NRC abused its discretion in approving an emergency plan that lacked planning for an area within the EPZ and which also lacked a service contract with local bus drivers. See also Rockford League of Women Voters v. NRC, 679 F.2d 1218 (7th Cir.1982); Porter County Chapter of the Izaak Walton League of America, Inc. v. NRC, 606 F.2d 1363 (D.C.Cir.1979); Illinois v. NRC, 591 F.2d 12 (7th Cir.1979). Upon our own careful examination of the petitions and supporting documentation, we do not find that the Director was arbitrary and capricious in his determination that there was "reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency" for the Davis-Besse facility. 10 C.F.R. Sec. 50.54(s)(2)(ii). In so holding, we recognize that a section 2.206 petition is one of the only ways the public or the state can challenge the adequacy of an emergency preparedness plan for an operating plant, cf. Simmons v. Arkansas Power & Light Co., 655 F.2d 131, 134 (8th Cir.1981), but also recognize that petitioners are not foreclosed from filing a new petition under section 2.206 if the circumstances at the time suggest that it is appropriate for the NRC to hold a hearing on the matter.
 
 
 51
 Since it is clear in this case that the Director did not abuse his discretion, we need not determine the much larger question of whether the NRC Director's decision was reviewable if he had in fact acted arbitrarily. Therefore, the decision of the NRC Director is AFFIRMED.
 
 
 52
 HILLMAN, Chief District Judge, dissenting.
 
 
 53
 I respectfully dissent. The clear, unequivocal language of 42 U.S.C. Sec. 2239(a)(1) requires the United States Nuclear Regulatory Commission (the Commission) to grant a hearing to petitioners, the Toledo Coalition for Safe Energy and the State of Ohio, following their 10 C.F.R. Sec. 2.206 petition to the Commission seeking investigation and a hearing on the issues related to the status and workability of the emergency and evacuation plans for the population living within the ten mile radius of Davis-Besse Nuclear Power Station. ("In any proceeding under this chapter ... the Commission shall grant a hearing upon the request of any person whose interests may be affected by the proceeding." 42 U.S.C. Sec. 2239(a)(1).)
 
 
 54
 Contrary to the majority's suggestion, nothing in the statute limits the hearing requirement to proceedings occurring before a construction permit is issued. Cf. Union of Concerned Scientists v. U.S. Nuclear Regulatory Commission, 735 F.2d 1437, 1438-39 (D.C.Cir.1984), cert. denied sub nom. Arkansas Power & Light Co. v. Union of Concerned Scientists, 469 U.S. 1132, 105 S.Ct. 815, 83 L.Ed.2d 808 (1985) (the statute "mandates a public hearing before a construction permit can be issued. After a permit is issued, the prospective operator must apply for a license. The [Atomic Energy] Act requires a hearing before the license is issued only if requested by an interested party.") (footnote omitted). Likewise, the regulations relied on by the majority do not contradict the statute, as they are silent concerning the Commission's obligation to grant petitioners a requested hearing on their 2.206 petition. See 10 C.F.R. Secs. 50.47 & app. E, 50.54(s).
 
 
 55
 Admittedly, Justice Brennan writing for the Supreme Court in Florida Power & Light Co. v. Lorion, 470 U.S. 729, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985), expressly declined to decide "whether the Commission properly denied respondent Lorion's request for a hearing on her 2.206 petition" in light of "the statutory hearing requirement of 42 U.S.C. Sec. 2239(a)(1)." 470 U.S. at 742 n. 10, 105 S.Ct. at 1606 n. 10. Nevertheless, such a requirement is implicit in the Lorion court's labeling of a 2.206 petition as a licensing proceeding. In addition, the following language from Lorion, albeit dicta, strongly suggests that the Commission must hold a hearing upon request of a 2.206 petitioner:
 
 
 56
 If initial review in the court of appeals hinged on whether a hearing before the agency actually occurred, then some licensing proceedings will be reviewed in the courts of appeals while others will not depending on whether a hearing is requested. It is clear that Sec. 2239 contemplates the possibility of proceedings without hearings. Absent a request from a person whose interest may be affected by the proceeding no hearing is required. 42 U.S.C. Sec. 2239(a)(1) ('In any proceeding under this chapter ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding'). Thus if no one requests a hearing or if the only request comes from a person whose interest cannot be affected by the issues before the Commission in the proceeding, no hearing will be held. See, e.g., Bellotti v. NRC, 233 U.S.App.D.C. 274, 725 F.2d 1380 (1983). The locus of judicial review would thus depend on the 'fortuitous circumstance' of whether an interested person requested a hearing, see Crown Simpson Pulp Co. v. Costle, 445 U.S. 193, 196-197, 100 S.Ct. 1093, 1094-1095, 63 L.Ed.2d 312 (1980). This sorting process would result in some final orders in licensing proceedings receiving two layers of judicial review and some receiving only one. 'Absent a far clearer expression of congressional intent, we are unwilling to read the Act as creating such a seemingly irrational bifurcated system.' Id., at 197, 100 S.Ct., at 1095.
 
 
 57
 470 U.S. at 741-42, 105 S.Ct. at 1605-06 (emphasis added).
 
 
 58
 Further support that a requested hearing is mandatory on the part of the Commission is found in the legislative history of the Atomic Energy Act. Again, in Lorion Justice Brennan describes in detail the historical development of the review provisions of the Atomic Energy Act. Id. at 737-740, 105 S.Ct. at 1603-05. The original House and Senate bills contained no provision for hearings in licensing determinations. Concern at the committee level led to an amendment providing for a hearing on "any agency action." This provision understandably was deemed to be too broad a response to the perceived need. Consequently, the "hearing requirement was tailored to the scope of proceedings under the licensing subchapter." Id. at 739, 105 S.Ct. at 1604.
 
 
 59
 Since I am satisfied that a hearing should have been held upon petitioners' request, I would reverse for that reason alone. I express no opinion on the majority's legal conclusion that "we do not find that the Director was arbitrary and capricious in his determination that there was 'reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency' for the Davis-Besse Facility."
 
 
 60
 Practically speaking, however, in light of recent disclosures and admissions by the Department of Energy, and in the present atmosphere of concern and fear on the part of those living in the immediate vicinity of nuclear plants in Ohio and elsewhere, I view the comforting assurances of the Director with at least some skepticism. These assurances are especially troubling in light of the criticism of the Director's conclusions levied by the Governor of Ohio and his blue ribbon committee.
 
 
 61
 The majority states that this court must be "most deferential" to the Commission in the field of nuclear matters because "the Commission is making predictions, within its area of special expertise, at the frontiers of science...." Perhaps so. But I question whether a detailed, comprehensive, efficient, and speedy evacuation plan for residents adjacent to a nuclear power plant involves "frontiers of science." Even if the majority is correct, however, this court's deference to bureaucratic decisions cannot be absolute. As Justice Marshall reminded us in his concurrence in Heckler v. Chaney, 470 U.S. 821, 848, 105 S.Ct. 1649, 1664, 84 L.Ed.2d 714 (1985):
 
 
 62
 Law has reached its finest moments when it has freed man from the unlimited discretion of some ruler, some civil or military official, some bureaucrat.
 
 
 63
 Congress has seen fit, through the adoption of 42 U.S.C. Sec. 2239(a)(1), to deny the Commission the discretion to act on 2.206 petitions without holding a hearing where one has been requested. Accordingly, whether, as petitioners here claim, the Commission has defaulted on its fundamental responsibilities to protect the public from nuclear accident must be decided as mandated by statute in an open, give-and-take forum where the truth is more likely to emerge.
 
 
 
 *
 The Honorable Albert J. Engel assumed the duties of Chief Judge effective April 1, 1988
 
 
 **
 Honorable Douglas W. Hillman, Chief Judge of the United States District Court for the Western District of Michigan, sitting by designation
 
 
 [1]
 Section 50.47(a) provides:
 (1) Except as provided in paragraph (d) of this section, no operating license for a nuclear power reactor will be issued unless a finding is made by NRC that there is reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency.
 (2) The NRC will base its finding on a review of the Federal Emergency Management Agency (FEMA) findings and determinations as to whether State and local emergency plans are adequate and whether there is reasonable assurance that they can be implemented, and on the NRC assessment as to whether the applicant's onsite emergency plans are adequate and whether there is reasonable assurance that they can be implemented. A FEMA finding will primarily be based on a review of the plans. Any other information already available to FEMA may be considered in assessing whether there is reasonable assurance that the plans can be implemented. In any NRC licensing proceeding, a FEMA finding will constitute a rebuttable presumption on questions of adequacy and implementation capability.
 (emphasis added).
 
 
 [2]
 10 C.F.R. Sec. 50.54(s)(3) (1988) states:
 The NRC will base its finding on a review of the FEMA findings and determinations as to whether State and local emergency plans are adequate and capable of being implemented, and on the NRC assessment as to whether the licensee's emergency plans are adequate and capable of being implemented. Nothing in this paragraph shall be construed as limiting the authority of the Commission to take action under any other regulation or authority of the Commission or at any time other than that specified in this paragraph.
 
 
 [3]
 It is also worth noting that the deadlines set by the Ohio Agency fell within the 120 day deadline provided by the regulations. See 10 C.F.R. Sec. 50.54(s)(2)(ii) (1988). 120 days from the final Director's decision would be March 1987, the time at which a full emergency exercise, which included Lucas County, was scheduled