### COMMONWEALTH OF MASSACHUSETTS, Petitioner,

v.

### UNITED STATES NUCLEAR REGULATORY COMMISSION and United States of America, Respondents.

No. 88–2211.

United States Court of Appeals, First Circuit.

Heard May 1, 1989.

Decided June 29, 1989.

---

Stephen A. Jonas, Deputy Atty. Gen., Chief, Public Protection Bureau, with whom James M. Shannon, Atty. Gen., and John Traficonte, Asst. Atty. Gen., Chief, Nuclear Safety Unit, were on brief, for petitioner.

Carole F. Kagan, Sr. Atty., with whom William C. Parler, Gen. Counsel, William H. Briggs, Jr., Sol., E. Leo Slaggie, Deputy Sol., and Jeffrey P. Kehne, Land and Natural Resources Div., Dept. of Justice, were on brief, for respondents.

R.K. Gad III with whom James B. Levy, Ropes & Gray and William S. Stowe were on brief, for intervenor, Boston Edison Co.

Before BOWNES and BREYER, Circuit Judges, and GRAY,* Senior District Judge.

BOWNES, Circuit Judge.

Petitioner, the Commonwealth of Massachusetts, requests that we set aside three actions taken by the respondents, the United States and the United States Nuclear Regulatory Commission (collectively, NRC or Commission), with respect to the operation of Pilgrim Nuclear Power Station (Pilgrim) by the Boston Edison Company (Edison), which is an intervenor in this action. NRC and Edison moved to dismiss the petition on jurisdictional grounds. For the reasons set forth below, we deny the petition; we do not dismiss it on jurisdictional grounds.

## I. FACTS

In 1972, Edison was issued a license to operate Pilgrim. Because of problems, Pilgrim was shut down voluntarily by Edison in April 1986. The shut down and continued cessation of operation were accomplished without a formal order by the NRC. The NRC required, however, that Edison satisfy it that certain improvements had been made before it would allow the restart of Pilgrim. These improvements covered 47 items involving operations, maintenance and security. In August 1987, the Federal Emergency Management Agency (FEMA) withdrew its finding that Pilgrim's off-site emergency plan[1] was adequate. Shortly thereafter, NRC informed Edison that a decision to restart Pilgrim would also involve consideration of the matters raised by FEMA.

By late 1988, the NRC staff had completed its review of Edison's improvements and recommended that the Commission approve restart. On December 9, 1988, the Commission held a meeting with state and local officials at which the officials stated that restart was inappropriate because of the current state of the emergency plans. The NRC staff reiterated its position that, although the improvements were not complete, there had been sufficient progress in all troubled areas to warrant restart. On December 21, 1988, the Commission voted unanimously to allow restart by a staged power ascension plan under NRC staff oversight.

On December 29, 1988, the NRC denied part of a Commonwealth petition to modify, suspend or revoke Pilgrim's license brought pursuant to 10 C.F.R. §§ 2.202, 2.206.[2] The NRC had previously denied other parts of this petition with respect to issues not germane to the present case. The only relevant issue concerned deficiencies in the emergency plans. The NRC's reasons for denying this part of the petition were set forth in a published decision.

---

* Of the Central District of California, sitting by designation.

1. An off-site emergency plan is one for the area surrounding the nuclear power plant.

2. This petition was different from the one at issue in *Massachusetts Public Interest Research Group, Inc. v. NRC,* 852 F.2d 9 (1st Cir.1988).

*See Boston Edison Co.,* 28 N.R.C. 814 (1988).

On January 5, 1989, the NRC granted Edison its third exemption from the requirement under 10 C.F.R. 50 App.E § IV F. 3 that it conduct a biennial full-participation emergency preparedness drill. Edison was exempted from that requirement "provided that such an exercise be conducted within 120 days after the completion of the power ascension program." 54 Fed. Reg. 336, 338 (1989).

On December 21, 1988, the Commonwealth filed a petition in this court seeking review of the NRC's decision to allow Pilgrim to restart. The petition was amended to include NRC's subsequent denial on December 29, 1988 of the Commonwealth's petition to modify, suspend or revoke Pilgrim's license. The Commonwealth has also requested that the NRC's grant of an exemption to Pilgrim from emergency preparedness drills be addressed at this time. Its motion to amend, now pending before this court, to include the emergency drill exemption for review is hereby granted because all of the NRC's actions bear on the same basic issue—emergency plans at Pilgrim. The Commonwealth seeks reversal of the actions by NRC allowing Pilgrim to restart, denying its petition and granting Edison the exemption. It also contends that the 47 modifications required prior to restart and the emergency drill exemption entitled it to a hearing pursuant to 42 U.S. C. § 2239(a) (§ 189(a) of the Atomic Energy Act) and asks that we order such a hearing and suspend the NRC's orders pending the hearing.

On January 11, 1989, we permitted Edison to intervene. On January 24, 1989,

NRC and Edison moved to dismiss the petition on four jurisdictional grounds: (1) there was no "final order" under 28 U.S.C. § 2342(4) and 42 U.S.C. § 2239(b); (2) the Commonwealth is not a "party" under 28 U.S.C. § 2344; (3) the NRC's order did not involve the "granting, suspending, revoking or amending" of Pilgrim's license under 42 U.S.C. § 2239(a); and (4) denials of § 2.206 petitions [3] are not reviewable under *Massachusetts Public Interest Research Group, Inc. v. NRC,* 852 F.2d 9 (1st Cir. 1988) (*Mass. PIRG*).

On February 21, 1989, the Commonwealth moved for an interlocutory injunction to prevent Pilgrim from being operated at more than five percent of full power. On March 7, we denied the motion but ordered an expedited briefing and argument schedule.

We address initially the first two issues raised by the motion to dismiss: finality and the Commonwealth's "party" status. Thereafter, we turn to the issues raised by the petition and incorporate in that discussion the other issues raised by the motion to dismiss.

## II. MOTION TO DISMISS

### A. *Final Order*

■ Review of NRC decisions is governed by the Hobbs Act, 28 U.S.C. § 2342(4).[4] Recently we addressed the finality requirement and stated:

The standard for determining whether an agency has taken final agency action within the meaning of the Administrative Procedure Act is set forth in *Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic,* 400

---

**3.** Section 2.206 petitions are requests made by any person to have the NRC institute proceedings to modify, suspend or revoke a license already granted by the NRC.

**4.** This section grants exclusive jurisdiction to the court of appeals over "all final orders of [NRC] made reviewable by section 2239 of title 42." 42 U.S.C. § 2239 provides in pertinent part:

(a)(1) In any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction per-

mit, or application to transfer control, ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding.

(b) Any final order entered in any proceeding of the kind specified in subsection (a) of this section shall be subject to judicial review in the manner prescribed in ... section 10 of the Administrative Procedure Act, as amended.

U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970): "[T]he relevant considerations in determining finality are whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action." *Id.* at 71, 91 S.Ct. at 209 (citations omitted).

*Mass. PIRG,* 852 F.2d at 13; *see also Dickinson v. Zech,* 846 F.2d 369, 371 (6th Cir.1988) ("an order is final only if it 'imposes an obligation, denies a right, or fixes some legal relationship, usually at the consummation of an administrative process.'") (quoting *NRDC v. NRC,* 680 F.2d 810, 815 (D.C.Cir.1982)).

The December 21, 1988 decision authorizing the restart of Pilgrim was final. The decision was the last action necessary to be taken by the NRC prior to Edison being allowed to restart Pilgrim. Indeed, Pilgrim has already resumed low level operation. Barring some unforeseen event at Pilgrim, the NRC will take no further action. There is thus no ongoing proceeding for judicial review to disrupt. And the decision determined Edison's right to restart Pilgrim. The grant of an exemption from emergency drills is a final order for the same reasons the decision to restart is: there is no ongoing proceeding to disrupt and the exemption determined Edison's right not to conduct the drill. Finally, we have already held that the denial of a § 2.206 petition is a final action. *Mass. PIRG,* 852 F.2d at 13–14.

**B.** *Commonwealth as a "Party"*

■ NRC and Edison next argue that because the Commonwealth was not a party to the NRC's actions, it cannot be a "party aggrieved by the final order." 28 U.S.C. § 2344.[5] This argument is circular. The Commonwealth is, in part, claiming that the NRC should have made it a party

to these actions by holding hearings and instituting certain proceedings. The NRC cannot now claim that by refusing to grant the Commonwealth's requests to become a party, the NRC's decisions are beyond review.

### III. COMMONWEALTH'S RIGHT TO A HEARING

The Commonwealth contends that it was entitled to a hearing pursuant to 42 U.S.C. § 2239(a) before Pilgrim was restarted.[6] It argues that the NRC's actions—requiring 47 improvements, granting the exemption from emergency drills, and allowing Pilgrim to restart—amounted to either an amendment to or a reinstatement of Edison's license to operate Pilgrim.

**A.** *Amendment*

■ The Commonwealth contends that by requiring Edison to address 47 items and by granting the exemption from emergency drills, NRC amended Edison's license.

The Third Circuit was faced with a similar issue: whether an NRC decision that 155 conditions be met before restart constituted a license amendment requiring a hearing. *In re Three Mile Island Alert, Inc.,* 771 F.2d 720 (3d Cir.1985) (*TMI*), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1460, 89 L.Ed.2d 717 (1986). The court held this was not a license amendment; it reasoned as follows:

> The sole effect of that Order is to lift the 1979 shutdown orders; the licensee has no greater operating authority by virtue of the May 29, 1985 Order than it had on July 1, 1979. It is true that the Commission, as a condition of lifting its shutdown order, has imposed numerous restrictions on the way in which the licensee may exercise its existing authority, but petitioners have pointed us to nothing in this record which indicates that the Commission has purported to effect

---

**5.** This section provides in pertinent part: "Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies."

**6.** The relevant part of this statute is set forth in note 4, *supra.*

amendments to the license or that license amendments are necessary to permit the licensee to operate in accordance with the restrictions which have been imposed. The imposition of conditions on the lifting of the stay and thus on the licensee's interim operations does not establish that the Commission has purported to amend the outstanding license since the Commission's regulations contemplate that such restrictions may be imposed during the course of a proceeding to determine whether or not license amendments or other actions are appropriate.

*Id.* at 729 (footnotes omitted); *see also San Luis Obispo Mothers for Peace v. NRC,* 751 F.2d 1287, 1314 (D.C.Cir.1984) (*SLO*) (lifting of a license suspension is not an amendment to the license), *reh'g en banc on other grounds,* 789 F.2d 26 (D.C.Cir.), *cert. denied,* 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986). We adopt this reasoning and hold that the imposition of 47 requirements on Edison prior to restart was not a license amendment.

The exemption to the regulation requiring biennial emergency drills raises a different problem because Edison's license requires it to operate in accordance with NRC regulations, one of which calls for holding such drills. The NRC granted the exemption pursuant to 10 C.F.R. § 50.12(a)(2)(v).[7] The same regulation which imposes the emergency drill requirement, 10 C.F.R. 50 App. E § IV F. 3, allows for exemptions to it, 10 C.F.R. § 50.12(a)(2)(v). The exemption did not change Edison's duty to follow NRC rules; it only changed which rule applied for a brief period of time. Edison was thus operating in accordance with its unaltered license. This is not a situation in which the NRC permanently exempted the licensee from following a specific license requirement. Nor is this a case where the NRC has changed Edison's license in such a way that Edison is no longer required to follow NRC's regulations and rules. Rather, this is a case where the NRC has temporarily exempted the licensee, on the basis of an existing rule, from one of many rules made generally applicable by the license. This does not amount to a license amendment.

## B. *Reinstatement*

■ We agree with the Commonwealth that the decision to allow Edison to restart Pilgrim was a reinstatement of Edison's license. NRC's and Edison's argument that because there was no formal revocation of Edison's license there could be no reinstatement is not tenable.

Edison, by its voluntary shutdown and continued cessation of operations, made it unnecessary for the NRC to revoke formally its license. The NRC nonetheless stated clearly and consistently that it would not allow Pilgrim to restart until it was satisfied with Edison's improvements.[8] The fact that the NRC did not call its decision to restart a "reinstatement" of the license is not controlling. *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 1199–1200, 86 L.Ed. 1563 (1942) ("the particular label placed upon [its action] by the Commission is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive."). The substance of the NRC's action was that Edison could not operate Pilgrim pursuant to its license until the NRC al-

---

**7.** This section states:
> (2) The Commission will not consider granting an exemption unless special circumstances are present. Special circumstances are present whenever—
> &ast; &ast; &ast; &ast; &ast; &ast;
> (v) The exemption would provide only temporary relief from the applicable regulation and the licensee or applicant has made good faith efforts to comply with the regulation.

**8.** Edison's contention that it could have restarted at any time without first obtaining the NRC's approval is not supported by the record. *See,* *e.g.,* August 18, 1987 letter from NRC to Edison at 2 ("The determination to restart the Pilgrim plant will involve, in part, consideration of the FEMA identified emergency planning issues."); December 31, 1986 letter from NRC to Edison ("The NRC is looking for strong evidence of progress at Pilgrim prior to restart.... Further, you should note that we plan to complete a SALP review prior to reaching a position regarding the restart of the Pilgrim facility."). SALP is an acronym for "Sytematic Assessment of Licensee Performance."

lowed it to do so. The decision allowing this was a reinstatement of the right to operate Pilgrim pursuant to the license that had been in effect prior to the shutdown.

■ Holding that the NRC's action was a license reinstatement does not, however, mean that the Commonwealth is entitled to a hearing.[9] A hearing is mandatory only when the proceeding concerns the "granting, suspending, revoking, or amending" of the license. 42 U.S.C. § 2239(a).[10] In a case involving the lifting of a license suspension, the District of Columbia Circuit stated:

> As we have discussed above, what legislative history there exists suggests that Congress intended the provisions of the section to be construed quite literally. If a particular form of Commission action does not fall within one of the eight categories set forth in the section, no hearing need be granted by the Commission.
>
> Section [2239(a)] makes no mention of the lifting of a license suspension. Petitioners have suggested no reason for construing such action as an "amendment," and our examination of the section suggests none. The lifting of a suspension does nothing to alter the original terms of a license; indeed, it *removes* a significant impediment to the enforcement of those terms. Nor do we believe that Congress intended the lifting of a license suspension to be subsumed within the statutory category of license suspensions. If it had, then we should also conclude that license revocations are implicitly included in the category of license grants; but Congress found it necessary to list revocations as a separate category. Because none of the actions specified in section [2239(a)] may be said to include the lifting of a license suspen-

sion, we conclude that such action does not give rise to the right to a hearing. *SLO*, 751 F.2d at 1314 (footnotes omitted; emphasis in original). We can see no principled reason to distinguish between the lifting of a license suspension and the reinstatement of a license for purposes of § 2239(a). The effects are the same: the licensee may now operate again under its original license; the terms of the license have not been altered. Because reinstatement is not listed as a specific action giving rise to a hearing, no hearing right is created by § 2239(a).[11]

## IV. REVIEW OF NRC'S ACTIONS

■ The NRC's actions with respect to licensing matters are reviewable by this court even when no hearing is mandated. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 737, 105 S.Ct. 1598, 1603, 84 L.Ed. 2d 643 (1985) ("We conclude ... that Congress intended to provide for initial court of appeals review of all final orders in licensing proceedings whether or not a hearing before the Commission occurred or could have occurred."). We thus review the three actions contested by the Commonwealth: (1) the restart decision; (2) the exemption from the emergency drill regulation; and (3) the denial of the Commonwealth's § 2.206 petition to modify, suspend or revoke Pilgrim's license. The parties agree that the first two are reviewed under 5 U.S.C. § 706(2)(A), *i.e.*, were the NRC's actions "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." The parties also agree that the § 2.206 denial is reviewed under the standard set forth by this court in *Mass. PIRG*, 852 F.2d 19: did the NRC inexcusably default on its fundamental responsibility to protect the public safety.

---

**9.** It does mean that there is judicial review of this action. *See* section IV, *infra.*

**10.** The other grounds for a mandatory hearing set forth in § 2239(a) are not relevant to this case.

**11.** Because we find that no hearing was required, we need not decide whether the Com-

monwealth is a "person whose interest may be affected by the proceeding" entitled to a hearing under § 2239. *Cf. Belotti v. NRC*, 725 F.2d 1380 (D.C.Cir.1983) (holding that the Commonwealth was not such a person with respect to an earlier amendment of Pilgrim's license).

## A. *The Restart Decision*

The scope of review of NRC actions is extremely limited.

The Atomic Energy Act of 1954 is hallmarked by the amount of discretion granted the Commission in working to achieve the statute's ends. The Act's regulatory scheme "is virtually unique in the degree to which broad responsibility is reposed in the administering agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objective." *Siegel v. AEC,* 130 U.S.App.D.C. 307, 312, 400 F.2d 778, 783 (1968).

*Public Service Co. of N.H. v. NRC,* 582 F.2d 77, 82 (1st Cir.), *cert. denied,* 439 U.S. 1046, 99 S.Ct. 721, 58 L.Ed.2d 705 (1978). This review is "at its most deferential" when it involves scientific or technical issues. *Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983). In reviewing the findings made by the NRC, we may not "displace the [NRC's] choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] *de novo.*" *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The Third Circuit explicated the standard of review when it reviewed a similar vote to restart a nuclear power plant:

> Our "limited, albeit important, task" is to review "agency action to determine whether the agency conformed with controlling statutes." *Id.* at 97, 103 S.Ct. at 2252. In undertaking this task, we must be mindful both of the Congressional policy choice favoring the development of nuclear power and of the Congressional mandate that the Commission be charged with the responsibility of protecting the public health and safety while overseeing the activities of the nuclear power industry.

*TMI,* 771 F.2d at 728; *see also Commonwealth of Mass. v. United States,* 856 F.2d 378, 382–83 (1st Cir.1988) ("we must uphold the agency's action so long as it is 'reasonable and defensible.'") (quoting *Bureau of Alcohol, Tobacco & Firearms v. FLRA,* 464 U.S. 89, 97 & n. 7, 104 S.Ct. 439, 444, & n. 7, 78 L.Ed.2d 195 (1983)).

The Commonwealth contends that the NRC abused its discretion by allowing Pilgrim to restart despite problems with the emergency plans. In particular, it argues that FEMA's conclusion that the plans were inadequate should have been given more weight and that the NRC relied "on mischaracterizations of the record and distorted and hopeful conclusions about the status of emergency planning for the area." Petitioner's Br. at 39. Although the NRC's opinion denying the Commonwealth's § 2.206 petition to modify, suspend or revoke Pilgrim's license had not been issued when the NRC allowed restart, both sides agree that the reasoning set forth in it was the basis for the NRC's conclusions with respect to the restart decision as well as being the basis for its denial of the Commonwealth's § 2.206 petition.

For a plant such as Pilgrim—one in operation before 1981—the NRC, not FEMA, has the final decision-making responsibility with respect to the adequacy of emergency plans. *State of Ohio ex rel. Celebrezze v. NRC,* 868 F.2d 810, 815–16 (6th Cir.1989). The NRC must, however, "base its finding on a review of the FEMA findings and determinations ... and on the NRC assessment" of the plans. 10 C.F.R. § 50.54(s)(3). As the Sixth Circuit stated:

> In summary, it is clear that section 50.54(s)(3) does not require formal FEMA approval for operating plants.... [U]nder the applicable section 50.54(s) the responsibility for making final determinations on the adequacy of off-site emergency preparedness plans rests with the NRC. That section specifically provides: "Nothing in this paragraph shall be construed as limiting the authority of the Commission to take action under any other regulation or authority of the Commission or at any time other than that specified in this paragraph." *See also* 44 C.F.R. § 350.3(e) (1987) (supporting NRC's view that it can make determinations of reasonable assurance and issue operating license without formal FEMA approval).

*Ohio ex rel. Celebrezze,* 868 F.2d at 815–16. Thus, although the NRC must base its ultimate finding on a *review* of FEMA's findings and determinations, it need not give those findings conclusive weight. Here, the NRC in its opinion discussed each point of concern raised by FEMA in its 1987 determination of inadequacy and discussed subsequent FEMA determinations as well. *See, e.g., Boston Edison,* 28 N.R.C. at 821 ("The August 1987 FEMA report included this as one of the six significant emergency preparedness issues. The FEMA position [on this issue] was modified subsequent to the issuance of FEMA's August 1987 report...."). By basing its final conclusions in part on a review of FEMA's findings, the NRC acted properly.

The other issue is whether the NRC based its determination on "mischaracterizations" of the record. It is important to note that the NRC did not find that Edison's plans were fully satisfactory. Rather, it found that "substantial progress" had been made and that the "progress is continuing." *Boston Edison,* 28 N.R.C. at 827. In making its determination, the NRC addressed each point raised by the Commonwealth in its § 2.206 petition and by FEMA in its August 1987 determination.

The Commonwealth's argument that the NRC has "mischaracterized" and "distorted" the record is, in reality, a complaint that the NRC did not give greater weight to evidence provided by state and local officials and drew conclusions from the evidence that were different than the one's the Commonwealth would have wished. This, however, does not make the NRC's action arbitrary or capricious, and it is not for us to reassess the evidence.

Rather than address each of the many points raised by the Commonwealth, we discuss for illustration purposes, one of its most serious claims: that the NRC "base[d] its decision on alleged statements of local officials which were not, in fact, made." Petitioner's Br. at 43. The Commonwealth contends that local officials did

not make statements attributed to them by the NRC that "local authorities are sufficiently familiar with the plans and procedures to properly respond and have indicated that they would do so." Petitioner's Br. at 43. In late 1988, the NRC met with local officials including selectmen and civil defense directors. The officials stated that progress had and was being made; they also expressed deep concern over the fact that the plans were in many ways incomplete, were untested and relied on inadequately trained personnel. *See, e.g.,* Testimony of Ms. Thompson, Chairperson of Plymouth Board of Selectmen: "I cannot express too strongly that while Plymouth has come a long way in the planning process, we still have a long way to go."; "To summarize, we are working assiduously, but our radiological planning is far from being complete, and therefore, is not approved at the local level; has had no higher review; and is untested." This is, in effect, what the NRC reported in *Boston Edison,* 28 N.R.C. at 823: "Although the [civil defense directors] expressed concerns related to the status of the plans and procedures and with the availability of personnel and training, all of the [civil defense directors] expressed the opinion that the state of emergency preparedness is much improved."[12] The NRC did not mischaracterize these statements, rather it chose to emphasize the positive and downplay the negative and based on this assessment, to allow the restart of Pilgrim. This conclusion based on all available information is for the NRC to make, not us.

The evidence that the Commonwealth highlights in the record indicates that Edison's plans are not perfect and that improvements in many areas are still needed, but that is generally what the NRC found. *See, e.g., Boston Edison,* 28 N.R.C. at 824: "the staff concludes that there has been substantial progress in offsite emergency preparedness at Pilgrim.... Furthermore, current ongoing efforts are expected to

---

12. To the extent that the Commonwealth is complaining not of what the NRC stated in *Boston Edison,* but rather of what it states in its brief to us, this complaint is irrelevant. The NRC, in making its decisions, did not rely on this brief; it relied on the material set forth in *Boston Edison.*

fully resolve the remaining concerns." The NRC provided a reasoned response to the Commonwealth's and FEMA's concerns based on information provided by state and local officials, Edison, FEMA and the NRC's staff. Its findings were not arbitrary or capricious.[13]

**B. *The Exemption From Emergency Drills***

■ The Commonwealth argues that the NRC's granting to Edison of an exemption from the requirement that it hold biennial drills of its emergency plan was arbitrary and capricious. We do not agree. As the Commonwealth acknowledges, the exemption was based in large part on the same considerations as were discussed in *Boston Edison*. We have already found that NRC's determinations of those considerations not to be arbitrary and capricious. Furthermore, the exemption was also based on the fact that Edison's emergency plans are not yet complete. The NRC agreed with Edison that to hold a drill based on plans which are not completed would be futile and granted Edison a temporary reprieve. But, the NRC, in the same breath, emphasized the need for Edison both to finalize its emergency plans and to conduct a drill with all due speed; the exemption only lasts until 120 days after Edison returns to full operation. The NRC did not act arbitrarily or capriciously in granting the exemption.

**C. *The Denial of the § 2.206 Petition***

■ Denials of § 2.206 petitions are reviewable by courts of appeals. *Lorion*, 470 U.S. 729, 105 S.Ct. at 1598. But, such denials are usually solely within the NRC's discretion and our review is extremely limited. *Mass. PIRG*, 852 F.2d 9. In that case we addressed the issue left opened by *Lorion*, 470 U.S. at 735 n. 8, 105 S.Ct. at 1602 n. 8, whether denials of § 2.206 petitions were committed to the agency's discretion by law. *Id.* at 14. We held that § 2.206 denials were "the very sort of

agency decisionmaking which [*Heckler v.*] *Chaney* [470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)] cited in support of the presumption of immunity from judicial review." *Id.* at 19. We noted, however, that this holding "does not place the agency above the law." *Id.* And, that a § 2.206 denial "which 'is so extreme as to amount to an abdication of its statutory responsibilities' might be reviewable." *Id.* (quoting *Chaney*, 470 U.S. at 833 n. 4, 105 S.Ct. at 1656 n. 4). We would only overturn a § 2.206 denial " 'if we were strongly convinced that the Commission was inexcusably defaulting on its fundamental responsibility to protect the public safety from nuclear accidents.' " *Id.* (quoting *Rockford League of Woman Voters v. NRC*, 679 F.2d 1218, 1222 (7th Cir.1982)).

The Commonwealth's § 2.206 petition was based, in relevant part, on the deficiencies it and FEMA perceived in Edison's emergency plans. We have already found that the NRC's findings and conclusions on this issue were not arbitrary or capricious. It follows, *a fortiori*, that the denial of the petition cannot be overturned on the basis of the even more limited review accorded under *Mass. PIRG*, 852 F.2d 9.

## CONCLUSION

The Commonwealth was not entitled to a hearing before the NRC decided to allow Pilgrim to restart.

The actions taken by the NRC were not arbitrary or capricious.

The NRC's and Edison's motions to dismiss on jurisdictional grounds are denied.

The Commonwealth's motion to amend is granted.

The Commonwealth's petition for review is denied.

---

13. We also note that a finding of inadequacy in emergency plans does not require the closing of a power plant. 10 C.F.R. § 50.54(s)(2). Thus, the Commonwealth may not be entitled to the ultimate relief it seeks—the closing of Pilgrim pending the implementation of adequate emergency plans—even if it is correct in asserting that Edison's plans are inadequate.